Volume 1

Pages 1 - 45

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )
                                    )
    vs.                             )   NO. CR 08-0730-WHA-22
                                    )
MAURICIO URIAS,                     )
                                    )   San Francisco, California
                Defendant.         )   Tuesday
                                    )   November 4, 2008
_____ )   2:27 p.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          Joseph P. Russoniello
                            United States Attorney
                            450 Golden Gate Avenue, Box 36055
                            San Francisco, CA  94102
                            (415) 436-6758
                            (415) 436-6753 (fax)
                        **BY:  WAI SHUN WILSON LEUNG**

**For Defendant:**          Harry Crane Singer, Attorney at Law
                            117 Beaumont Street
                            San Francisco, CA  94118
                            (415)885-5916
                            (415) 750-9827 (fax)
                        **BY:  HARRY CRANE SINGER**


**Reported By:**      **Lydia Zinn, CSR #9223, RPR**
                      **Official Reporter - U.S. District Court**

1   <u>**APPEARANCES (CONT'D)**</u>

2   **For Pretrial Services:**   Pretrial Services
                                 450 Golden Gate Avenue
3                                San Francisco, CA   94102-3434
                                 (415) 436-7512
4                                (415) 436-7517
                          **BY:   ALLEN LEW**
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:   What's the next case?

2        THE CLERK:   Okay.  It's Criminal Number CR. 08-0730,

3   United States versus Mauricio Urias.

4        MR. SINGER:   Good afternoon, your Honor.

5        THE CLERK:   Counsel.

6        MR. SINGER:   Harry Singer, on behalf of Mr. Urias,

7   who's now present in custody.  Good afternoon, your Honor.

8        THE COURT:   Good afternoon, Mr. Singer.  How are you?

9        MR. SINGER:   Pretty good.  I've got an infection on

10  my leg, but other than that, I'm fine.

11        THE COURT:   How did that happen?

12        MR. SINGER:   They don't know and I don't know.  Last

13  time, it took nine months to heal from a little, teeny mark to

14  a -- the pain is unbelievable, and they haven't been able to

15  figure out what it is.

16        THE COURT:   Just pour alcohol on it.

17        MR. SINGER:   That's what it feels like.

18        THE COURT:   Just kill all those germs.

19        MR. SINGER:   I can't find any germs in there.

20        MR. LEUNG:   Wilson Leung, for the Government,

21  your Honor.

22        THE COURT:   Who do we have here?

23        THE DEFENDANT:   My name is Mauricio Urias,

24  your Honor.

25        THE COURT:   Okay.  Welcome to the court.

```
1          All right.  This is an appeal from an order allowing

2  release on conditions by Judge Larson.  So the Government can

3  tell me what's going on.

4          MR. LEUNG:  Certainly, your Honor.  Last Friday

5  Judge Larson issued an order authorizing the release of the

6  defendant, subject to the principal conditions of a $150,000

7  PRB co-signed by his parents, and further conditions to be

8  determined after a bail review hearing in a couple of weeks.

9          In the meantime, the Government sought a stay from

10 your Honor, which was granted.  And we sought to appeal this

11 case.  And we would now respectfully ask that the defendant be

12 detained, based on both risk of flight, and danger to the

13 community.

14          Should I proceed, your Honor?

15          THE COURT:  I'd like to hear all your reasons, and so

16 forth, and then I'll hear from Mr. Singer.  Go ahead.

17          MR. LEUNG:  Your Honor, first, note there is a

18 presumption case.  The defendant is charged with some very

19 serious crimes, including racketeering 924(c) plus (b)(1)(A)

20 narcotics conspiracy, as well as various (b)(1)(B) narcotics

21 charges.

22          THE COURT:  You say "presumption case."  What is

23 that?  Go over it more.  I used to know this very well, but I

24 don't get these appeals very often.  So when you say

25 "presumption," you mean a presumption of risk of flight, or
```

1  presumption of danger to the community?

2          MR. LEUNG:  There is a presumption of both,

3  your Honor; a rebuttable presumption under The Bail Reform Act.

4          THE COURT:  All right.  And that's -- it's a

5  presumption on account of what?

6          MR. LEUNG:  That Congress has deemed that these

7  particular charges are so serious, that there is a rebuttable

8  presumption that the defendant is both at risk of flight, and a

9  danger to the community.  All right.

10          THE COURT:  All right.  So -- and which particular

11  charge is it that triggers that presumption?

12          MR. LEUNG:  It would be the Count Four, which is the

13  924(c) charge, as well as the narcotics offenses, beginning

14  with Count Twenty-six through Thirty-four.

15          The defendant is charged in Count One with

16  racketeering conspiracy, which carries a maximum sentence of

17  life; in Count Two, with conspiracy to commit murder in aid of

18  racketeering, which carries a maximum penalty of ten years; in

19  Count Three, with conspiracy to commit assault with a dangerous

20  weapon in aid of racketeering, which has a maximum of three

21  years; in Count Four, with using or possessing a firearm in

22  furtherance of a crime of violence, which carries a maximum

23  penalty of life, but more significantly, carries a mandatory

24  minimum of five, seven, or ten years' imprisonment, to be

25  imposed consecutive to any other term of imprisonment.

1          In addition to these first four counts, your Honor,

2    he is also charged with various narcotics offenses, beginning

3    with Count Twenty-six, which is conspiracy to distribute and to

4    possess with the intent to distribute 50 grams or more of

5    natural methamphetamine, which carries a maximum sentence of

6    life, and mandatory minimum sentence of ten years'

7    imprisonment.

8          Counts Twenty-seven, Twenty-eight, Twenty-nine, and

9    Thirty charge the defendant with the substantive offense of

10   distribution of 5 grams or more of actual methamphetamine.

11   Each count has a maximum penalty of 40 years, and a mandatory

12   minimum sentence of five years' imprisonment.

13         And he's charged in Counts Thirty-one, Thirty-two,

14   Thirty-three, and Thirty-four with distribution of quantities

15   of cocaine, which do not carry a mandatory minimum sentence.

16         So the narcotics offenses plus the 924 --

17         **THE COURT:**  Can I just stop you for a second, just on

18   this one point?

19         Mr. Singer, do you agree that this is a presumption

20   case?

21         **MR. SINGER:**  Yes.  Any case in which the minimum

22   actual -- minimum mandatory is greater than ten years triggers

23   the presumption.

24         **THE COURT:**  All right.

25         **MR. SINGER:**  Then, after that, it's a rebuttal

1  presumption.  Then, after the defendant presents evidence, then

2  if that rebuts the presumption, the presumption doesn't go

3  away.  It stays in as one of the factors to be considered, but

4  it's not an absolute.

5          **THE COURT:**  Okay, all right.

6          Let me hear now from the Government on it.  So if

7  there is a presumption -- all right.  So what's the next step

8  in the analysis?

9          **MR. LEUNG:**  So the next step in the analysis,

10  your Honor, is:  this is a presumption case.  And the defendant

11  has an incentive to flee, because he's facing crushing

12  penalties.  If he's convicted, he faces a maximum of life.  He

13  faces a mandatory minimum sentence of 15 years if he's

14  convicted on the narcotics charge in Count Twenty-six, as well

15  as the 924(c) charge in Count Four.

16          In addition, your Honor, the Government's case is

17  very strong.  We have coöperative testimony, for instance,

18  indicating that this defendant was a member of the

19  Mara Salvatrucha for a number of years; that is, MS-13.

20          We have photographs seized during the execution of

21  search warrants which depict the defendant flashing gang signs

22  that are associated with the MS-13 gang.

23          We also have, during the execution of a search

24  warrant at his home just about two weeks ago -- October 22nd --

25  a T-shirt which says, "R.I.P. Trucho," which we believe, based

1   on information from coöperators as well as this investigation,

2   means, "Rest in peace, Trucho."

3          Trucho was an MS-13 member -- Carlos Reyes -- killed

4   by rival Norteño gang members in 2004, which trigerred a bit of

5   a gang war.  So that T-shirt demonstrates his -- certainly his

6   affiliation with the gang.

7          In addition, over the years we've also seized

8   documents such as gang rosters, contact lists, which has the

9   defendant's gang moniker, "Puppet," on it, which indicates that

10  he was present at meetings, and also paid membership dues, as

11  required by gang rules.

12         In addition, your Honor, the Government's evidence is

13  particularly strong with respect to the narcotics charges in

14  this case, which are both part of the RICO charge, and charged

15  separately and substantively, beginning in or about May of 2006

16  through in or about January of 2008.

17         The Government used a coöperating witness who set up

18  eight controlled purchases of actual methamphetamine as well as

19  cocaine from this defendant.  Each setup -- each meeting was

20  set up through consensually recorded telephone calls.  And the

21  coöperator wore a body wire for each of these transactions.  I

22  believe the body wire failed on one of these eight purchases.

23         In addition, for each of the purchases the

24  transaction was surveilled by DEA agents and ICE agents as

25  well.

1          And so, on or about May 24th, 2006, the defendant

2   agreed to sell 5.2 grams of actual methamphetamine to the

3   coöperator, which was subsequently delivered.

4          Same thing on June --

5          **THE COURT:**  How many grams?

6          **MR. LEUNG:**  5.2 grams of actual methamphetamine.  The

7   net amount was higher.

8          June 28th, 2006, the defendant agreed to sell another

9   quantity of actual methamphetamine, which tested as 5.2 grams.

10          On July 11th, 2006, there was another sale, which

11   later tested as 10 grams of actual methamphetamine.

12          And on January 23rd, 2007, there was one last sale --

13   a fourth sale of methamphetamine -- which tested as 44.6 grams

14   of actual methamphetamine.

15          Each of these four transactions involved a quantity

16   of methamphetamine that was sufficient to trigger a five-year

17   mandatory minimum by themselves.  And, in the aggregate, they

18   total more than 50 grams, which triggers the ten-year mandatory

19   minimum that is -- that I reference in Count Twenty-six.

20          In addition to this, your Honor, the defendant also

21   engaged in four additional controlled sales of cocaine on July

22   13th, 2007, August 17th of 2007, September 14th of 2007, and

23   January 22nd of 2008.

24          Furthermore, your Honor, on or -- on October 22nd of

25   2008, when the defendant was arrested, law enforcement agents

```
 1  executed a search warrant at his home, 378 Forest View Drive in
 2  South San Francisco.  And there they found, in addition to the
 3  T-shirt that I referenced earlier, about an ounce of cocaine as
 4  well as several thousand dollars.
 5          The defendant himself was away from his house.  He
 6  was arrested in Alameda, after being pulled over in his car.
 7  He consented to a search of his car.  And law enforcement
 8  agents found in the car approximately $6,000, which later
 9  tested -- well, which later drug dogs alerted to, suggesting
10  that the money had been in contact with narcotics.
11          In addition, several hours after the defendant's
12  arrest, a person walking by the area where the defendant was
13  pulled over found a funny-looking water bottle in the bushes
14  and called the Alameda Police Department.  Alameda Police
15  Department came and examined the bottle; found that it
16  contained a false bottom, in -- which contained approximately
17  4.9 grams of a substance that field tested as cocaine.  So, up
18  to the day of his arrest, your Honor, the defendant apparently
19  was involved in the trafficking of narcotics.
20          We would also note that on October 22nd, a search
21  warrant was also executed on the supplier for the defendant.
22  In his new -- in numerous calls with the coöperating witness,
23  the defendant related -- referred to a supplier who showed up.
24  And this person was identified as John Briez, who's a
25  co-defendant, who has been arrested, and is presently on his
```

1   way into the Northern District of California from Guam.   During

2   the execution of the search warrant on John Briez's home in

3   Daly City, law enforcement agents found, among other things, a

4   quantity of cocaine, a quantity of methamphetamine, a quantity

5   of marijuana, as well as an unloaded .45 caliber H & K handgun.

6          So, your Honor, the Government's case is very

7   compelling.   If nothing else, the narcotics charges by

8   themselves are very strong, and they carry a substantial

9   sentence.

10          In addition, we respectfully submit that the

11   defendant is not likely to be eligible for any safety-valve

12   relief from the mandatory minimums from -- for the narcotics

13   offenses, because of the fact that a coconspirator in the case

14   possessed a firearm:   the aforementioned H & K .45 caliber

15   pistol.   If that was reasonably foreseeable to the defendant,

16   he was precluded from safety valving.

17          We'd also note that the defendant's participation in

18   MS-13 and the gang's activities -- taxing drug dealers, and

19   extorting drug dealers -- would also suggest defendant was part

20   of a criminal enterprise that engaged in violence.   In fact,

21   other sources have reported that the defendant was able to sell

22   his narcotics unmolested by other gangs because of his

23   participation in MS-13.

24          So, from a very real perspective, your Honor, the

25   fearsome reputation of MS-13 is part of the narcotics conduct

1   of this defendant.

2           **THE COURT:**  Is this -- we haven't had an initial

3   hearing in this case, but is this a capital case?

4           **MR. LEUNG:**  The defendant himself is not charged with

5   capital crimes.  There is one co-defendant who is charged with

6   a capital offense -- Guillermo Hererra -- murder in aid of

7   racketeering.

8           **THE COURT:**  With murder?

9           **MR. LEUNG:**  Murder in aid of racketeering.

10          **THE COURT:**  Oh, all right.

11          Mr. Singer, what do you say to rebut the presumption?

12          **MR. SINGER:**  Well, your Honor, with respect to the

13  evidence -- and the strength of the evidence, of course, has to

14  be considered, at least; but the membership in this gang, and

15  the so-called "pay and owe sheets," and dues that are paid -- I

16  believe that those are at least five years old or older.

17          I don't know that that was intentional on the part of

18  Mr. Leung to indicate that they might be more recent, but he

19  hasn't been involved with this gang for quite some time.  And

20  whatever involvement he might have had that they have evidence

21  about is over five years old, that he may have paid dues to

22  the -- to the -- to the organization -- is quite a long time

23  ago.

24          **THE COURT:**  Well, you're suggesting that he was part

25  of the gang, but is no longer part of the gang?

1      **MR. SINGER:**  I don't think that there's any evidence

2  that -- I don't think that he was a member of the gang at least

3  for the last five or seven years.  I don't know that he was

4  even a member of the gang prior to that.

5      **THE COURT:**  You're saying that the Government has no

6  evidence over the last five years.  Let me just stop.

7      Is that all right, Mr. Leung; that the evidence that

8  you were telling me about was five years old?

9      **MR. LEUNG:**  I don't think that would be a fair

10  assessment, your Honor.  The documents we seized are not dated,

11  but the investigation itself is only three years old.

12      In addition, your Honor --

13      **THE COURT:**  But those sales of drugs that you

14  mentioned with the confidential informant --

15      **MR. LEUNG:**  They were from 2006 up to January of this

16  year.

17      In addition, your Honor, on October 22nd we seized

18  additional quantities of cocaine from the defendant's house,

19  and from near where the defendant was stopped.

20      **THE COURT:**  All right.  I misunderstood.  Mr. Singer,

21  sounds like it's within five years.

22      **MR. SINGER:**  No.  The drug sales, which he's charged

23  with independently with another two defendants, other than the

24  other big, huge part of the case with respect to the

25  conspiracies and the racketeering charges -- those are within

1    the 2000 to 2008 time frame.

2          What I'm saying is that his membership, or the

3    evidence that they have that he was paying dues into this

4    organization, would be at least five years old.

5          I don't know what -- where they seized that, but I

6    know that the pay and owe dues under the name of "Puppet,"

7    which is a moniker that -- they have alleged that it belongs to

8    this defendant -- would be prior to the five years.

9          The drug sales are small drug sales, so the whole

10   total amount -- I mean, they're not small, but the magistrate

11   found them to be either small and/or of a medium amount.  The

12   total amount of the cocaine is a little bit over a pound.  And

13   the total amount of the methamphetamine for all the eight sales

14   is about 65 grams.

15         **THE COURT:**  Is it enough to trigger a mandatory

16   minimum?

17         **MR. SINGER:**  It doesn't trigger the ten-year minimum.

18         Fifty grams would trigger a ten-year minimum

19   mandatory under the conspiracy theory.  Individual sales of

20   5 grams or 10 grams would not.  They would you be smaller.

21         **THE COURT:**  Five-year statute?

22         **MR. SINGER:**  One of them triggers a five-year

23   statute.  The cocaine sales do trigger the five-year statute;

24   but not under the ten-year minimum mandatory, other than under

25   the conspiracy.

1          He is not alleged to have been involved in any of the

2    violent acts in the conspiracy.  He's only alleged to have been

3    involved in drug sales as part of the conspiracy.  There's no

4    indication that he was involved in any of the violent acts or

5    the extortion; the taxing; the murder, for sure.  And he

6    physically was not involved in any of those, and there are no

7    allegations that he was.  I think Mr. Leung has admitted that

8    he was not a part of that.

9          THE COURT:  Are you a C.J.A. lawyer?

10          MR. SINGER:  Yes, I am.

11          THE COURT:  You're appointed by the C.J.A.?

12          MR. SINGER:  Yes, I am.

13          MR. LEUNG:  Count Twenty-two, the narcotics

14    conspiracy, aggregates all of the methamphetamine sales.  So

15    that carries a ten-year mandatory minimum.

16          The substantive -- the four substantive

17    methamphetamine sales -- each carries a five-year mandatory

18    minimum.

19          The cocaine sales do not carry a mandatory minimum.

20          MR. SINGER:  That's correct.

21          MR. LEUNG:  So I just wanted to clarify that.

22          THE COURT:  All right.

23          Go ahead, Mr. Singer.

24          MR. SINGER:  Well, other than that part of it, I am

25    responding to the amount of the evidence that they have, which

1  should be, under the case law, the least amount of

2  consideration in determining whether bail should be set or any

3  conditions could be set; the idea being that he's certainly not

4  going to continue to be involved in narcotic sales.  And if

5  there was some concern that he might be possibly a danger to

6  the community, the conditions that were imposed and can be

7  imposed would be such that he would be monitored.  He would be

8  surveilled, if necessary; that he would not have access to be

9  able to do drug dealing.

10         And so therefore, we're not talking about past

11  dealing.  We're talking about evidence that would be certainly

12  strong against him with respect to guilt or innocence; but he

13  has that right to go forward and to prove his innocence if he

14  can.  So that's one of the things that the case law indicates

15  that should be the least most considered.

16         The other thing should be community ties.  He has

17  substantial community ties.  I don't know if your Honor was

18  able to get a copy of that.

19         **THE COURT:**  Does he have community ties with any

20  foreign country?

21         **MR. SINGER:**  No, he doesn't.

22         **THE COURT:**  No relatives in El Salvador?

23         **MR. SINGER:**  His family's all up here.  He has --

24         **THE COURT:**  No relatives at all?  Grandparents?

25  Friends?

1          MR. SINGER:  I see them shaking "No" back there, but

2    I'm not so sure.  His mother's here.  His father's here.

3          THE COURT:  How about grandparents?  Uncles?  Aunts?

4          MR. SINGER:  Are there grandparents in El Salvador?

5          THE COURT:  I don't know what they're saying, but --

6          MR. SINGER:  Some in Spanish, and some --

7          THE COURT:  Sometimes -- I mean, it would be

8    surprising to me if he didn't have some friends or relatives in

9    El Salvador.

10          THE DEFENDANT:  (Shakes head from side to side).

11          MR. SINGER:  No.

12          THE COURT:  How about Mexico?

13          MR. SINGER:  No, I don't think any of the family's

14   from Mexico.

15          THE COURT:  Pretrial Services told me he had a child

16   in Mexico.

17          MR. SINGER:  There is an indication that he has a

18   child in Mexico.  He hasn't seen the child, apparently, for the

19   last four months.

20          THE COURT:  What is the child doing down there?

21          MR. SINGER:  He says he has no child in Mexico.

22          I saw that in the Pretrial Report also.  That

23   Pretrial Report --

24          By the way, your Honor, I spoke to Anthony Granados,

25   a Pretrial Service officer.  And he indicated to me that he

1  would want -- he had wanted to update that report, because he

2  hadn't had a chance to verify some of that information.

3  However, we were able to bring those people to court before

4  Judge Magistrate Larson, and that information was verified.

5  And when I spoke to him on the phone, he said that he --

6  because of that being verified, that he would have changed his

7  recommendation to the $100,000, the two sureties posted.  And

8  Judge Magistrate Larson took that into consideration.

9          And I believe that there's going to be an additional

10  amended report that's going to be filed, but I -- as far as the

11  child in Mexico, I don't know that.  The defendant indicates

12  that that's not his child --

13          **MR. LEUNG:**  Your Honor --

14          **MR. SINGER:**  -- but --

15          **THE COURT:**  I want to hear everything Mr. Singer has

16  to say.

17          **MR. SINGER:**  Also, we have a lot of conditions that

18  would keep him from being a flight risk.  Besides the fact that

19  he has community ties, he has a job here that he's been working

20  at for the last four or five years.

21          **THE COURT:**  What is that job?  What is the job?

22          **MR. SINGER:**  He works for Best Catering.  And his

23  employer is here.

24          **THE COURT:**  Full time?

25          **MR. SINGER:**  Pardon?

1          **THE COURT:**  Full time?

2          **MR. SINGER:**  Yes, full time.  And before that, he had

3   a job.  It was about three years.

4          **THE COURT:**  Here's the problem, even if he's got a

5   job, if he's got jobs:  if he's dealing drugs.  Mr. Leung says

6   he's dealing drugs recently.  Isn't that a problem?

7          **MR. SINGER:**  They indicate that he's in possession of

8   money and -- and possibly drugs recently, but that last

9   transaction, I think, was in January of 2008.  And it is a

10  problem, but I think that what the restrictions are:  being in

11  a halfway house, which is basically incarceration.  The only

12  time he would be released would be to go to work and to meet

13  with me and the --

14         **THE COURT:**  Yeah, but people can go to work and claim

15  they're going to work, and then not go to work; or go to work

16  for part of the day, and deal drugs the rest of the day.

17         **MR. SINGER:**  The other problem is that if he does

18  something like that, then his parents are going to lose

19  $150,000, which is not a small amount of money.  And he's been

20  living with his father for the last nine years.  And they're

21  not wealthy people.

22         This is a substantial amount of their wealth that's

23  been posted for this bond.  And his mother is -- does not live

24  in that same house.  They're separate.

25         **THE COURT:**  Is it already posted?

1          MR. SINGER:  Yes, it has been posted.

2          THE COURT:  What amount has been posted?

3          MR. SINGER:  $150,000.

4          THE COURT:  All the paperwork is signed?

5          MR. SINGER:  No.  It's a personal recognizance bond.

6   They both signed.  His mother, who's -- he lives with his

7   stepmother and his father.  And his mother lives in Stockton.

8   Both his birth mother and his father signed a $150,000 personal

9   recognizance bond.

10         THE COURT:  Is it unsecured?

11         MR. SINGER:  Unsecured, but they have property that's

12  worth that much money.  And there will be monitoring, of

13  course.  He's -- the Judge had released him into a halfway

14  house, where he'll be.  He'll have to stay in the halfway

15  house, and he'll be monitored by the Pretrial Services.

16         Also, if he commits any kind of a crime or if he

17  flees or anything like that, these people are going to lose a

18  substantial amount of their wealth.  He doesn't want that to

19  happen.  And I think he's going to abide by these conditions.

20  They took a lot of trust in putting up their property to do

21  that and -- not putting up their property, but putting up their

22  promise to pay the $150,000.

23         It was originally recommended by Pretrial that it be

24  a $100,000, two sureties.  And the Judge raised it to $150,000,

25  with two sureties, and set additional conditions that he stay

1  in a halfway house, and not be released.

2          **THE COURT:**  Would the Cornell Corrections take him,

3  here in San Francisco?

4          **MR. SINGER:**  I believe that's where he would be

5  incarcerated.

6          I had put on the last page of my memorandum the

7  conditions that would be imposed or have been already

8  previously imposed:  no travel outside the Northern District;

9  no contact with the co-defendants; that he surrender all of his

10  travel documents; not make an application for new ones; that he

11  not commit the general no federal, state, or local crimes; and

12  that he not possess any firearms or dangerous weapons; and that

13  he report to Pretrial Services, as required by the Pretrial

14  Services.

15          These are practically -- there are about 13

16  conditions.  And then there's one kind of catchall condition

17  that can be imposed if there's any question about flight or

18  danger to the community or drug dealing or anything like that.

19  And they have been imposed -- almost all of them have been

20  imposed.

21          I think there's one that he get -- seek mental

22  treatment.  He doesn't need that.  There's no indication that

23  he's in need of that.  So pretty much the Magistrate has

24  covered almost all of those conditions and -- including the

25  $150,000 of security posted by his mother and his father -- by

```
1  his birth mother and his father.  It's not the same family.

2            MR. LEUNG:  Your Honor, if I may --

3            THE COURT:  Wait.  Somebody back here is raising

4  their hand.

5            UNIDENTIFIED SPEAKER:  I'm sorry to interrupt.

6  Peter Balogh.  I'm an attorney and, actually, a friend.  I am

7  familiar with the defendant.  If it pleases your Honor, I would

8  love to say some words about --

9            THE COURT:  Come up here.

10           MR. BALOGH:  Should I proceed?

11           THE COURT:  Are you representing the defendant?

12           MR. BALOGH:  No.  I'm actually a friend of the

13  defendant.

14           THE COURT:  Come up here so you can introduce

15  yourself again.

16           MR. BALOGH:  Yes.  Thank you.  Peter Balogh.  And

17  that's B-a-l-o-g-h.  I'm licensed to practice in California.  I

18  have my own practice in Pacifica.  I've been an attorney for 15

19  years.  I'm actually licensed in the District Court as well.  I

20  live on 20th Street in the Mission, but my office is in

21  Pacifica.

22           And I'd like to say that I met Mr. Urias probably

23  about a year and four months ago.  And I met him at a local art

24  studio that is on 20th Street in the Mission.  And since that

25  time -- since that time, I've encountered him at the art
```

1  studio, which is run by a local artist in the Mission,

2  John Ramirez.  I've seen him there.  I've seen him at a local

3  restaurant at 22nd and Lexington in the Mission.  And I'd like

4  to say that I've also went to a theater -- *A Bronx Tale* -- that

5  was recently, I believe, at the Golden Gate Theater, that

6  Mr. Urias invited me to while he was working there.

7           And through all that experience, I've seen him

8  working in the catering business that was alluded to.  I've

9  seen him at the restaurant often where we've shared dinner

10 together.  I've seen him at the art studio.  I've never had

11 anything but a good impression of him.

12           I cannot speak to any of the charges at all.  I can

13 speak to the fact that he has been very honest.  He's been

14 very -- showed a lot of integrity to me and with me.  He was

15 courteous enough to invite me to see this theater performance.

16 And when I did see the performance, I saw him supervising the

17 employees, because he has a supervisory position there.  And I

18 saw that he had a great deal of ambition and integrity in the

19 way that he worked there.

20           I have also lived on 20th Street for about 15 years,

21 which has been a hotbed of gang activity for the whole time

22 that I've been there.  And I've observed, you know, the

23 activity and the people involved in the activity.  And I've

24 never seen him to interact with those folks.

25           That's not to say -- I'm not God.  I don't know what

1  goes on, you know, when I'm not there; but I do know the people

2  that I have observed.  And I've observed him not to be part of

3  that scene.  So I personally can vouch for his character.

4          I think he should be out on bail.  I have full

5  confidence that he would not flee, and that he would not engage

6  in any kind of activity.  I've known him for more than a year.

7          And that's basically it.  I'm happy to answer any

8  questions.

9          **THE COURT:**  All right.  Any questions by the

10  Government?

11          **MR. LEUNG:**  No, your Honor.

12          **THE COURT:**  All right.  Thank you, sir.

13          **MR. BALOGH:**  Thank you.  Thank you very much.

14          **MR. SINGER:**  Also, your Honor, his employer is here.

15  I know you had indicated some concern about what might happen

16  at work.  And I think he's being supervised by his employer

17  very closely.  And you might want to ask him any questions

18  about that.  I don't know, but I think he's been a pretty good

19  employee.

20          **THE COURT:**  All right.  Let's have him come forward.

21          All right.  Thank you for coming.  What's your name?

22          **MR. PERAZA:**  My name is Raoul Peraza, Junior,

23  (phonetic).  And I work for Best.

24          **THE COURT:**  Does anyone want him to be under oath?

25          **MR. LEUNG:**  No, your Honor.

1        **THE COURT:**  All right.  Please raise your right hand.

2        RAOUL PERAZA, JR.,  DEFENDANT'S WITNESS, SWORN.

3                    **<u>DIRECT EXAMINATION</u>**

4        **THE COURT:**  What's your name?

5        **MR. PERAZA:**  Raoul Peraza, Junior.

6        **THE COURT:**  All right.  Now, you realize you're under

7    oath?

8        **MR. PERAZA:**  Yes, sir.

9        **THE COURT:**  What do you have to say?

10       **MR. PERAZA:**  Well, he's been working for me for about

11   four years.  And he's helped me out a lot, and helped, you

12   know, like I --

13       **THE COURT:**  Full-time working?

14       **MR. PERAZA:**  Full time, yeah.

15       **THE COURT:**  What hours does he have?

16       **MR. PERAZA:**  It's always at night.  It's always from,

17   like, 6:00 to 2:00.  Sometimes we go past 3:00, 4:00 in the

18   morning.

19       **THE COURT:**  And what does he do for you?

20       **MR. PERAZA:**  He's a bar manager for me.  And he helps

21   me run the Broadway theaters downtown.  And he's been helping

22   me for about four years.  And, like, our department is flawless

23   because of him and another guy.  So, you know, he helps me with

24   cash control.  He's pretty honest with me.

25           I've always brought him along to do bigger events

Raoul Peraza, Jr. - DIRECT / The Court

1  with me, where we were dealing with, like, over a million

2  dollars in cash.  And he's always been there with us.  And

3  we've never had a problem with him.

4           **THE COURT:**  How about drugs?

5           **MR. PERAZA:**  I don't know anything about that, you

6  know.  I like --

7           **THE COURT:**  You're under oath now.

8           **MR. PERAZA:**  No.  I know.  I don't know.  I work with

9  him.  That's all I know about him.

10          **THE COURT:**  You work with drugs?

11          **MR. PERAZA:**  No, I don't work with drugs.  We've gone

12  out and had a few drinks.  I've never seen -- it's kind of like

13  a double life to me.  I don't think -- I don't know anything

14  about it.

15          **THE COURT:**  How about guns, weapons of any type?

16          **MR. PERAZA:**  No.

17          **THE COURT:**  Any gang activity?

18          **MR. PERAZA:**  Not that I know of.  Like, I've invited

19  him to my house to watch fights and play poker, you know.  I've

20  let him into my home.  I don't let anybody into my home, you

21  know, that I don't trust.  And he's been really trustworthy,

22  you know.

23          Like everything -- you know, all these accusations

24  against him, you know, I don't know anything about that.  Like

25  I -- I know that he's always showed up to work on time.  Any

*Raoul Peraza, Jr. - DIRECT / The Court*

```
 1  time, too, I've called him on the last minute, he's shown up.

 2          THE COURT:  Ever show up looking like he was high on

 3  drugs?

 4          MR. PERAZA:  No.

 5          THE COURT:  Any questions?

 6          MR. LEUNG:  Just one or two, your Honor.

 7                      CROSS-EXAMINATION

 8  BY MR. LEUNG

 9  Q.   Are you aware if the defendant has been engaged in illegal

10  activity?

11  A.   You know what?  It's a surprise to me when, you know, I

12  found out he wasn't coming to work, because he's never not

13  shown up to work.

14  Q.   Are you aware of whether the defendant had any prior

15  arrests or contacts with law enforcement?

16  A.   No.  I don't know anything about that.

17          MR. LEUNG:  Okay.  That's it.

18          THE COURT:  Okay.  All right.  Thank you, sir.

19          MR. SINGER:  Thank you.

20          Anyone else want to come forward and say anything?

21          MR. SINGER:  Well, there were some indications about

22  potential for violence.  And his girlfriend has indicated to me

23  that he never even raised his voice to her or her children.

24  And they've been together a couple of years; but I don't know

25  if she needs to come forward.  If you want her to, she'd be
```

1  more than happy to do that.  She's indicated to me that she's

2  never seen any kind of violence on his part.

3          **THE COURT:**  Well, I would have to ask her about

4  drugs, and so forth.

5          **MR. SINGER:**  Yeah, right.  I understand.

6          **THE COURT:**  Here are some questions I have.  Maybe

7  the Government knows about my Pretrial Services officer.  Why

8  don't you come forward?

9          **MR. LEW:**  Good afternoon, your Honor.  Allen Lew,

10 L-e-w.  First name, A-l-l-e-n.

11         **THE COURT:**  I'd like to know the full extent of

12 contacts of the defendant in El Salvador or Mexico.

13         **MR. LEUNG:**  Your Honor, we do not have any

14 information aside from what's contained in the Pretrial

15 Services Report, which indicates that the defendant remains a

16 citizen of El Salvador, and he reported coming into the U.S. in

17 1984, and that he is a lawful Green Card holder.

18         **THE COURT:**  All right.  Why can't we get more

19 information than that?

20         **MR. LEW:**  Your Honor, we could certainly in the

21 interim try to obtain more information.

22         Our process for the detention hearings is, generally,

23 start with an interview.  The interview lasts between 30

24 minutes to 45 minutes.  And then, after that, we'll generally

25 have one to two days to prepare the report.  And, given the

```
 1  time available, we're not able to always provide the Court with
 2  as much detail as what might be found in a presentence
 3  investigation.
 4          THE COURT:  Well, maybe we'll take some time to get
 5  some answers.  All right.
 6          What -- Mr. Leung, you ought to know the answer to
 7  this.  Was there any gun or other weapon ever found on the
 8  person or in the car or at the apartment of the defendant?
 9          MR. LEUNG:  Not the defendant, your Honor.
10          THE COURT:  So in connecting him to -- a gun was
11  found with this guy from Guam?
12          MR. LEUNG:  With his supplier, who was in Guam when
13  arrested.  His supplier actually lives in Daly City.
14          In addition, during the course of the investigation,
15  the Government seized or recovered approximately 20 guns from
16  the various members of the gang to which the defendant belongs.
17          THE COURT:  Does the defendant have any tattoos that
18  indicate that he's a member of this gang?
19          MR. LEUNG:  I believe he has tattoos which would
20  suggest that he is a member of the gang.  I believe he has a
21  "San Francisco" on the base of his neck, although I don't know
22  off the top of my head whether that's correct.
23          THE COURT:  What does Pretrial say on that?
24          MR. LEW:  Your Honor, we don't know.  I was sitting
25  in the gallery, your Honor.  And it does appear that he has
```

1   some type of tattoo on the base of his neck.

2            THE COURT:  What does that tattoo stand for?

3            THE DEFENDANT:  San Francisco Giants.  I'm a big fan.

4            MR. SINGER:  Looks like a Giants one, too.

5            THE COURT:  Any other tattoos?

6            THE DEFENDANT:  I have a dragon here.

7            THE COURT:  Any other tattoos?

8            THE DEFENDANT:  Snake one here as well.

9            THE COURT:  Any others?

10           THE DEFENDANT:  One down here.  It's just --

11           THE COURT:  You don't have to -- what is it?

12           THE DEFENDANT:  It says, "Bad Boy."

13           THE COURT:  Are any of those gang tattoos?

14           MR. LEUNG:  I don't know, your Honor.  The

15   San Francisco tattoo -- sometimes members of the 20th Street

16   Clique put "S.F. 20" as a tattoo to denote their gang

17   affiliation.  That is the MS-13 clique which operates on

18   20th Street.

19           MR. SINGER:  He does not have that tattoo,

20   your Honor.  And, as far as I know, the dragon and the snake

21   are not tattoos that are related to these kind of gang

22   activities.

23           THE COURT:  What kind of criminal record does the

24   defendant have?

25           MR. LEUNG:  The defendant has numerous arrests,

1 your Honor, dating from 1995 up through 2003.  I believe he

2 only has one, two -- three convictions for misdemeanors; but

3 the initial arrests were for some apparently very serious

4 crimes, including possession of narcotics, from 1997;

5 inflicting corporeal injury on a spouse or co-habitant, from

6 2001; false imprisonment with violence, from 2002; transport or

7 sell narcotics, and participating in a criminal street gang,

8 from 2003.  And --

9          THE COURT:  What happened on that last one?

10          MR. SINGER:  I think they all were dismissed.  In the

11 furtherance of justice and/or with insufficient evidence, all

12 of them were dismissed.

13          MR. LEUNG:  Yeah, that's correct, your Honor.  There

14 are only three misdemeanor convictions, though the initial

15 arrests would seem to suggest otherwise.

16          THE COURT:  Well, those three misdemeanors, were

17 they -- did any of those involve a gun or violence?

18          MR. SINGER:  No.  Well, violence.  There's a domestic

19 violence, I believe.

20          THE COURT:  Well, any of the misdemeanors that he was

21 convicted on?

22          MR. SINGER:  Yes.

23          THE COURT:  Which one was that?

24          MR. LEUNG:  September 2001.

25          THE COURT:  What was that again?

```
1          MR. LEUNG:  Excuse me.  November 9th of 2001, on the
2   very top of the table in the Pretrial Services Report,
3   November 9th, 2001, for misdemeanor battery.  And he received a
4   sentence of 36 months' probation, four days in jail.  Sentence
5   suspended.
6          THE COURT:  Who was the co-habitant?
7          MR. LEUNG:  I don't have that information,
8   your Honor.
9          MR. SINGER:  That was a previous girlfriend; not this
10  girlfriend at the present time.
11         THE COURT:  All right.  Have you tracked her down to
12  interview her?
13         MR. LEUNG:  We could try if we knew the name.
14         THE COURT:  Well --
15         MR. LEUNG:  We could look into the old police reports
16  as well.
17         MR. SINGER:  I believe it was some kind of an
18  altercation on the street.  They were arrested.  He was
19  arrested out on the street for an argument that took place.  I
20  don't know if there was any real physical battery or any
21  injury, but I -- as far as I know, there was not; but it did
22  take -- he did plead guilty to it, and receive a probationary
23  sentence, which he completed successfully.
24         THE COURT:  What is the -- what is -- you request
25  evidence that he's a member of this gang?
```

1          **MR. LEUNG:**  We have the testimony of several

2    coöperating witnesses.  We have photographs of him flashing

3    gang signs.  We also have --

4          **THE COURT:**  And how recently is that?

5          **MR. LEUNG:**  The photos themselves are undated,

6    your Honor.

7          **THE COURT:**  Are what?

8          **MR. LEUNG:**  Are undated.

9          **MR. SINGER:**  Five to eight years ago.

10         **MR. LEUNG:**  But we also have law enforcement

11   surveillance showing him on September 27th of 2007 at a place

12   called "Blondie's" with other MS-13 gang members, hanging out.

13         We also have -- again, we also have a controlled sale

14   as of January of 2008.

15         And the coöperators have indicated that the

16   defendant's particular function in the gang was to push

17   narcotics.

18         And we also have --

19         **THE COURT:**  I'm sorry.  What was January 2008?

20         **MR. LEUNG:**  January 27, 2008, was the last cocaine

21   purchase from this defendant.

22         **THE COURT:**  And when was the Blondie's event?

23         **MR. LEUNG:**  It was September 21st of 2007.

24         **THE COURT:**  What is your evidence on that?

25         **MR. LEUNG:**  Law enforcement surveillance, your Honor.

 1          **THE COURT:**  Has that been made known to the

 2   defendant?

 3          In other words, if we had an evidentiary hearing,

 4   could you bring that out and show us, so that I could see it?

 5          **MR. LEUNG:**  We would put on a witness who'll say that

 6   he was there with Douglas Largaespada, and various other

 7   codefendants.

 8          **MR. SINGER:**  It's a bar in the Mission District.  I

 9   don't know what they mean by "being present" with these

10   particular individuals.  I'm not -- but he was -- he goes to

11   this bar.  They frequent that bar.  They all live in that

12   neighborhood.

13          **THE COURT:**  But if you're hanging out with criminals,

14   it's not a good thing.

15          **MR. SINGER:**  I don't know if he was hanging out with

16   them, or he was just present in that bar at the same time they

17   were present in that bar.

18          **THE COURT:**  You got videotape to say that?

19          **MR. LEUNG:**  No, we don't, your Honor; but more

20   probative is that he had cocaine in his house on October 22nd.

21   He had money -- a large quantity of money that alerted -- that

22   a drug dog alerted to in his car on October 22nd.  And in the

23   location near his arrest, a quantity of cocaine was found

24   secreted in the false bottom of a water bottle.

25          **MR. SINGER:**  I don't know how that relates to the --

```
 1          THE COURT:  How much cocaine was found in his house?

 2          MR. LEUNG:  About 4.9 grams.

 3          THE COURT:  Where does that stand in terms of

 4   mandatories?

 5          MR. LEUNG:  That does not trigger any mandatories,

 6   your Honor.  The five-year mandatory threshold is 500 grams or

 7   more for cocaine.

 8          MR. SINGER:  Less than 1 percent.

 9          MR. LEUNG:  But if I may respond to some of the

10   arguments raised, first, your Honor, the Government's not

11   necessarily concerned that the defendant will flee to a foreign

12   country.

13          We're just concerned that he will not show up; that

14   he will hide.  It's possible to hide within the United States

15   and not answer the charges.

16          So we respectfully submit that even if he doesn't

17   have -- salvage active ties with El Salvador or Mexico or other

18   foreign countries, the point is he could go underground within

19   the United States.

20          THE COURT:  The FBI always finds them.

21          MR. LEUNG:  It takes a bit of effort and time,

22   your Honor.

23          MR. SINGER:  And his parents will have lost a

24   substantial amount of their money.  I don't think he wants to

25   do that.
```

1          **THE COURT:**  Come back to that and find out if it can

2    be secured.  Unsecured doesn't sound good; but go ahead.

3          **MR. LEUNG:**  Part two, your Honor.  Judge Larson

4    initially ordered the defendant into a halfway house for the

5    purpose of deciding whether any additional conditions would be

6    required in order to ensure the defendant's return to court,

7    and to prevent any danger to the community.

8          Judge Larson was concerned that the house in which

9    the defendant has lived for several years that he shares with

10   his parents was a place where cocaine was found, and apparently

11   was used as a stash house for the defendant's cocaine business.

12   And we have the same concern as well, your Honor.

13         The defendant has been selling drugs for a number of

14   years.  And putting him in the custody of his parents, with

15   whom he lived for the past several years, would seem to be more

16   of the same.  That's not really any change.

17         **THE COURT:**  But I thought Judge Larson said he should

18   go to a halfway house.

19         **MR. LEUNG:**  Judge Larson ordered bail under principal

20   conditions of $150,000 bond and two sureties, including his

21   father serving as custodian.  Judge Larson, however, in the

22   meantime, ordered that the defendant be put in a halfway house

23   until further review, because Judge Larson was concerned with

24   the fact that cocaine was found on October 22nd at the

25   defendant's home which he shares with his parents.

1          Judge Larson was going to revisit the order on

2    November 14th, I believe, at a special appearance.  He has

3    already scheduled bail review hearing for that.

4          We share Judge Larson's concern, and we believe that

5    it precludes the defendant's release, because, quite frankly,

6    your Honor, the defendant has been dealing drugs for a number

7    of years.  Cocaine was found in his house on October 22nd.

8    He's been living with his parents for all this time in --

9          **THE COURT:**  Well, do you object to the halfway house

10   part?

11         **MR. LEUNG:**  We object to the halfway house because

12   the halfway house is not particularly secure, your Honor.  It

13   is not jail.  It is not prison, and a person can walk away.

14         **THE COURT:**  It's also not his house, and not his

15   parents'.

16         **MR. LEUNG:**  It would be an improvement over the

17   house, but we respectfully submit that it's still not adequate.

18         In addition, your Honor, we would respectfully submit

19   that, while the defendant obviously has a lot of friends, they

20   don't know him.  The two individuals who spoke to the Court

21   both admitted that they don't know anything about these

22   charges.  One wasn't even aware that he had any prior arrests,

23   which he does.

24         So we would ask the Court to take --

25         **THE COURT:**  Well, you're right.  You've got to put

1  that in balance; but you also have to be -- I'm sure you know

2  that usually nobody comes forward to vouch for anybody in these

3  circumstances.  So the fact that he's got a couple of friends

4  who are willing to come forward -- that says something.

5         **MR. LEUNG:**  It says something, your Honor.  It says

6  that the defendant had been able to retain friends over a

7  number of years; but we would also note that the defendant

8  faces a mandatory minimum of 15 years' imprisonment if he's

9  convicted on Count Four and Count Twenty-six.  The bond right

10  now is $150,000.  $150,000 for 15 years of your life, I would

11  respectfully submit, is not a particularly large amount of

12  money.

13         **THE COURT:**  If you're not so sure, if you think he's

14  going to flee, but -- not flee out of the country.  I promise

15  you.  They have these cases.  They find them right away, within

16  a few months.  Instead of 15 years, it's 35 years.  And then

17  they never see the light of day again the rest of their life.

18  So it --

19         **MR. LEUNG:**  We would rather not be in a position --

20         **THE COURT:**  I know you wouldn't want to be in that

21  position, but --

22         All right.  I have an idea, but I don't want to have

23  another hearing on this.

24         **MR. SINGER:**  My understanding, your Honor, of what --

25  the concern of Magistrate Larson with respect to the updated

1  report was not about the halfway house.  He was considering the

2  possibility of putting him in the custody of his father, and

3  having him act as a custodian, but as a --

4        **THE COURT:**  We're not going to do that.

5        **MR. SINGER:**  Yeah.  I understand that.

6        **THE COURT:**  That's no good.  That's where the drugs

7  were.  If the parents were letting drugs go down in their own

8  house all this time, they're not going to be good custodians.

9        **MR. SINGER:**  I think that's what the Judge's concern

10  was; was not that -- he felt that the halfway house would be a

11  good alternative to the house, as a matter of fact.

12        **THE COURT:**  All right.  Well, look.  Let me give you

13  my tentative thought.  And we're going to come back.  I'm going

14  to give you a tentative view, and then I'm going to let both

15  sides have a couple of days to --

16        You have to stay in custody a little longer until I

17  can work this out.

18        I am concerned about the possibility of flight out of

19  the country.  And I would like to know more about that, and

20  give the Government a chance to dig up some information on

21  that, and Pretrial Services to do that.  I have had other cases

22  where that was a very real possibility.  Maybe it's not here,

23  but that's one issue.

24        The number-two issue is:  unsecured is no good.

25  They've got to -- they've got to have their house immediately

1   forfeited and foreclosed on if he misses one condition.

2           MR. SINGER:  His father is prepared to post.

3           THE COURT:  Not be prepared.  It has to actually be

4   done; all the paperwork already in there, before.

5           MR. SINGER:  I'd be more than happy to do that.  It

6   takes quite a long time.  I'll get started on that.

7           THE COURT:  Better get cracking on it.  I'm not

8   saying that if you do it, it's going to work.  There's no way,

9   unsecured.  "Unsecured" means the Government's got to go sue

10  people in order to -- and then they don't.  Then they go into

11  bankruptcy.  So this is unsecured.  Unsecured won't work.  It's

12  got to be totally secured.  All right?

13          So then that will be -- then any condition -- it

14  would have to be down the street at Cornell Corrections.  No

15  going to church.  No going to work.  The only time they ever go

16  out of that building would be to come to this building to see

17  either you at Pretrial Services -- we'll make available -- and

18  then to see Pretrial Services or come to court.  So there would

19  be no visiting with the family.  No visiting.  I mean, they can

20  come to visit him there --

21          MR. SINGER:  Right.

22          THE COURT:  -- but he can't leave that building.  And

23  if he were to leave that building or not come back on time, it

24  would be jail.

25          MR. SINGER:  Well, certainly there's a better

1   alternative than jail.  And this is going to take a long time

2   to put this case over.

3          **THE COURT:**  I'm going to give you one other example

4   where somebody -- it was after a conviction, but I let him out,

5   to my everlasting regret.  And very first day -- the very first

6   day, Pretrial Services caught him violating one of the primary

7   conditions.  It was like I say things.  And as soon as -- ah,

8   we fooled that judge.  And then -- so he went into custody, and

9   he's never come out since.  So that was a long time ago.

10         So if we were to do this, he could not go to work,

11  because I don't want him working.  Doing a bar at night?

12  That's just inviting trouble.  No way.  So he would be -- there

13  would be no employment.  There would be no church.  And there

14  would be no doctors' appointments without Pretrial authorizing

15  it first.  And the only time he could ever come out would be to

16  come to this building in order to see you, or Pretrial Services

17  would give you a conference-room meeting.

18         That's, in other words -- so, in other words, I would

19  want to make sure there was no drug dealing going on at all,

20  because this record does indicate that he's a drug dealer.

21         Now, working in his favor is these witnesses that

22  have come forward, and the fact that his criminal record is --

23  has no felonies.  He doesn't have any gun.  He doesn't seem to

24  have any gang tattoos.  And that his violence is -- looks like

25  a domestic -- the worst violence -- and I'm not downplaying

1   it -- is domestic violence a few years ago.

2           So -- and the Government is right.  He's facing

3   serious charges here.  You can be a small-time player in a

4   big-time gang that does bad things, and go to prison for the

5   rest of your life.

6           **MR. SINGER:**  I know that's --

7           **THE COURT:**  That's what the Government has been

8   trying in all these gang cases they're bringing.  I've got

9   others of them.  One of them, they're going for the death

10  penalty.

11          I'm telling you that if you are a member of a gang,

12  and even though you have a small role, if you are a member of a

13  gang that commits murder, and you get convicted, it's -- you're

14  looking at a lot of time, probably.

15          And that's what Mr. Leung is worried about; is that

16  your client, thinking about all the time he's looking at, might

17  decide to flee.  It's a legitimate concern.

18          I don't know the answer to this yet.  I want to think

19  about it.  I want to get more information and come back here.

20  And so maybe we come back on Friday.  What time Friday can you

21  come back?

22          I got a -- I'm going to be here in the afternoon

23  pretty late anyway.  How about two o'clock?

24          **THE CLERK:**  Sure, yeah.

25          **THE COURT:**  Two o'clock on Friday, we come back.

1          MR. SINGER:  I can do that, yeah.

2          In the meantime, I'll start getting the appraisal for

3     the house.

4          THE COURT:  Yeah, all of that.

5          Now, Mr. Leung, if you really think that a halfway

6     house with strict conditions is not tough enough, then you --

7     that's kind of the way I'm leaning, though, right now, is to

8     try that, and see.  And so maybe if you really want to resist

9     that, you ought to be doing some homework to come up with

10    something severe, more severe than this record shows now.

11         MR. LEUNG:  I'll do my homework, your Honor.

12         THE COURT:  Okay.  Anything more today?

13         MR. SINGER:  Not today, your Honor.

14         MR. LEUNG:  Nothing from the Government, your Honor.

15         MR. SINGER:  I think we've covered pretty much all of

16    it in our memorandum.  And the new information -- I will get

17    started on having his father get an appraisal for the house.

18         THE COURT:  I appreciate your help.  And I hope your

19    infection heals soon.

20         MR. SINGER:  I do hope so.

21         THE COURT:  All right.  Mr. Urias, thank you for

22    coming today.  And I am not sure where this is all headed, but

23    you'll just have to hang in there for a while.

24         THE DEFENDANT:  I'll do that.  Thanks for your time.

25         THE COURT:  Mr. Lew, would you go to work on all

1   those questions, and come see me, maybe, Thursday?

2              **MR. LEW:**  Yes, your Honor.

3              **THE COURT:**  I think we're done for today.

4              **MR. LEUNG:**  Thank you, your Honor.

5              (At 3:21 p.m. the proceedings were adjourned.)

6                                -   -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Lydia Zinn, CSR, RPR*
*Official Reporter - U.S. District Court*
*(415) 531-6587*

1                              **I N D E X**

2      **Witness**                                          **Page**

3      **Raoul Peraza, Jr.**

4      Direct Examination by the Court                      25

5      Cross-Examination by Mr. Leung                       27

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATE OF REPORTER

      I, LYDIA ZINN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CR. 08-00730-WHA-22, U.S.A. v. Mauricio Urias, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

    The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

Lydia Zinn, CSR 9223, RPR

/s/ Tuesday, November  18, 2008