1   SUSAN M. RAFFANTI, ESQ. - SBN 120993
    Law Offices
2   483 9th Street, Suite 200
    Oakland, CA 94607
3   (510) 451-2825
    sraffanti@gmail.com
4
    JOHN T. PHILIPSBORN, ESQ. - SBN 83944
5   Law Offices of John T. Philipsborn
    507 Polk Street, Suite 350
6   San Francisco, California 94102
    (415) 771-3801
7   jphilipsbo@aol.com

8
    Attorneys for Defendant JONATHAN CRUZ-RAMIREZ
9

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13   UNITED STATES OF AMERICA,        )   **Case No. CR-08-0730 WHA**
                                      )
14          Plaintiff,                )   **MEMORANDUM OF POINTS AND**
                                      )   **AUTHORITIES IN SUPPORT OF**
15   vs.                              )   **MOTION TO EXCLUDE**
                                      )   **FIREARMS RELATED EXPERT**
16   IVAN CERNA, et al, JONATHAN      )   **TESTIMONY [Jonathan Cruz-**
     CRUZ-RAMIREZ,                    )   **Ramirez]**
17                                    )
            Defendants.               )   **Dept: The Hon. William Alsup,**
18   _____ )           **District Judge**

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

The defense can only rely on what it has by way of disclosures in
bringing this motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

There have been significant changes in the analysis of the issues
presented since this Court ruled that some firearms expertise
can be admitted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

DISCUSSION AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

A.    There are questions about the technical knowledge specific to
      firearms evidence and firearms-related evidence that require the
      Court to assess the expertise in a case-specific context . . . . . . . . . . . . . . .  8

B.    Is firearms examination and identification the result of a reliable
      process?  The NRC cautions that it is not scientific or easily
      statistically verifiable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

C.    To get close to verifiability, there have to be clearly defined and
      verified methods, procedures and documentation - some of which
      are still missing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

D.    It is a violation of Due Process and the Fair Trial Right under the Fifth
      Amendment, of confrontation and cross-examination under the Sixth
      Amendment, and the Eighth Amendment reliability requirement, for
      the Government to be permitted to call expert witnesses to testify
      where these witnesses will rely mainly on a conclusory report,
      especially where their work papers and documentation are
      insufficient to demonstrate adherence to the scientific process . . . . . . . .  16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

1                    **<u>TABLE OF AUTHORITIES</u>**

2    **<u>Federal Cases</u>**

3    *Crawford v. Washington*, 541 U.S.36 (2004  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

4    *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)  . . . . . . . . . . 7, 14-17

5    *General Electric Company v. Joiner*, 522 U.S. 136 (1997) . . . . . . . . . . . . . . . . . . . .   14, 15

6    *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3rd Cir. 1994). . . . . . . . . . . . . . . .   15

7    *Kumho Tire Company v. Carmichael* 526 U.S. 17 (1999) . . . . . . . . . . . . . . . . . . . .  6, 7, 17

8    *Melendez-Diaz v. Massachusetts,* ___U.S.___; 129 S. Ct 2527 (2009)  . . . . . . . . . . .  5, 16

9    *U.S. v. Diaz, et al.*, CR-05-00167 WHA  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-6, 9, 10

10   *U.S. v. Glynn*, 578 F.Supp.2d 567 (S.D.N.Y.)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-6

11   *U.S. v. Monteiro*, 407 F.2d 351 (D.Mass. 2006)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

12   *U.S. v. Santiago*, 199 F.Supp.2d 101 (S.D.N.Y. 2002)  . . . . . . . . . . . . . . . . . . . . . . . . .   8

13   *U.S. v. Williams*, 506 F.3d 151 (2nd Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

14   *U.S. v. Willock* 682 F. Supp. 2d 512 (D. Md, 2010)  . . . . . . . . . . . . . . . . . . . . . . . . . .   4, 6

15   **<u>FRE</u>**

16   102  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 7, 13

17   403  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

18   702  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 8, 13

19   **<u>U.S. Constitution</u>**

20   Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

21   Sixth Amendment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

22   Eighth Amendment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14, 16

23   **<u>Texts</u>**

24   Biasotti, *The Principles of Evidence of Valuation as Applied to Firearms and*
     *Tool Mark Identification*, 9 Journal of Forensic Sciences 428, 430 (1964)  . . . . . . . . . .   13
25
     Biasotti and Murdock, *"Criteria for Identification"*, 16 AFTE Journal 16 (1984) . . . . .   15
26
     Bunch, *Consecutive Matching Striation Criteria: A General Critique*, 45 Journal of
27   Forensic Science 955 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

28

Faigman, *et al.*, *Firearms and Toolmark Identification: Legal Issues*, Chapter 29, 3
Modern Scientific Evidence (2002  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Flynn, *Toolmark Identification,* 2 Journal of Forensic Sciences 95 (1957) . . . . . . . . . . .  15

Giannelli and Imwinkelried, *Scientific Evidence* 633 (3d ed. 1999) . . . . . . . . . . . . . . .  15

Haag, L.C. *Identifiable Bullets from Glocks in 60 Seconds,* AFTE.org/2003 Training . . . . . . .  10

Hempel, *Philosophy of Natural Science* 49 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

Imwinkelried, "*Flawed Expert Testimony: Striking the Right Balance in Admissibility
Standards*" 18 ABA CRIM.JUST. 28, 29 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Moran, *A Report on the AFTE Theory of Identification and Range of Conclusions
for Tool Mark Identification and Resulting Approaches to Casework*, 34(2)
AFTE Journal 227, 227-228 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

National Research Council, *Strengthening Forensic Science in the
United States* in 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5, 12, 14, 15

Nichols, *The Scientific Foundation of Firearms and Toolmark Identification -
A Response to Recent Challenges*, California Association of Criminalists' News,
2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Saferstein, Dr. Richard, *Criminalists: An Introduction to Forensic Science*
(9th Ed, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

Schwartz, *A Systematic Challenge to the Reliability and Admissibility of Firearms and
Toolmark Identification*, 6 Columbia Science and Technology Law Review 2 (2005)  .  13

1  SUSAN M. RAFFANTI, ESQ. - SBN 120993
   Law Offices
2  483 9th Street, Suite 200
   Oakland, CA 94607
3  (510) 451-2825
   sraffanti@gmail.com
4
   JOHN T. PHILIPSBORN, ESQ. - SBN 83944
5  Law Offices of John T. Philipsborn
   507 Polk Street, Suite 350
6  San Francisco, California 94102
   (415) 771-3801
7  jphilipsbo@aol.com

8
   Attorneys for Defendant JONATHAN CRUZ-RAMIREZ
9

10             IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13 UNITED STATES OF AMERICA,        )   **Case No. CR-08-0730 WHA**
                                    )
14        Plaintiff,                )   **MEMORANDUM OF POINTS AND**
                                    )   **AUTHORITIES IN SUPPORT OF**
15 vs.                              )   **MOTION TO EXCLUDE**
                                    )   **FIREARMS RELATED EXPERT**
16 IVAN CERNA, et al, JONATHAN      )   **TESTIMONY [Jonathan Cruz-**
   CRUZ-RAMIREZ,                    )   **Ramirez]**
17                                  )
          Defendants.              )   **Dept: The Hon. William Alsup,**
18 _____)            **District Judge**

19

20    **I.    INTRODUCTION**

21        This motion is being filed pursuant to the Court's several scheduling Orders. It is

22 brought in an abundance of caution, to avoid a claim of waiver, or undue delay in filing.

23 However, it is being brought before necessary discovery, made available in other, similar

24 cases, has been made available in this one. The disclosures and discovery necessary to

25 fully argue and resolve it include (as the defense has previously argued in an expert-

26 specific discovery motion): the Laboratory procedures, SOPs, and standards applicable in

27 the pertinent Lab; and the proficiency testing results; error rates; and other criminalist-

28 related materials that would allow useful litigation of the forensic expertise issues

1   involved here to be addressed by the parties, and the Court.

2   Based on the combination of the discovery issues and other grounds argued below,

3   this motion seeks an order excluding opinion testimony from firearms examiners and

4   proffered  tool mark identification experts; an order for further, pertinent discovery; and, at

5   the very least, an order limiting the testimony of the proffered experts based on recent

6   developments discussed below.  The Cruz-Ramirez defense is well aware that this Court

7   has previously given at least one such prior set of motions an evidentiary hearing resulting

8   in a detailed Order permitting certain testimony from firearms and toolmark

9   examiners–part of the defense's objective, as explained in detail below, is to

10  demonstrate to this Court that the views it expressed about this area of forensic expertise

11  in 2007 in *U.S. v. Diaz et al.,* CR 05-00167 WHA  have been, and indeed should be,

12  opened to question. There have been significant developments that this Court must

13  consider in assessing what to do with the trickle of necessary discovery, and with the

14  proffered experts on firearms and firearms evidence.

15  **The defense can only rely on what it has by way of disclosures in bringing this**
16  **motion**

17  In bringing this motion, the defense is relying upon Government expert opinion

18  disclosures as follows: expert disclosures 248-255,  pertinent to San Francisco Police

19  Department (hereafter SFPD)  Criminalist Mark Proia (who is proposed to testify about

20  several analyses, none specific to Mr. Cruz-Ramirez); expert disclosures 263-270,

21  pertinent to SFPD Criminalist John Sanchez. Mr. Sanchez has examined firearms evidence

22  pertinent to Mr. Cruz Ramirez.; expert disclosures 270-278, pertinent to SFPD Criminalist

23  G. Andrew Smith. Mr. Smith has been used by the Government in prior cases to explain

24  firearms examination procedures.

25  This motion is also informed by firearms examination worksheets in expert

26  disclosures 400-422–all related to the work done by Mr. Sanchez.

27  Because this case charges several conspiracies against Mr. Cruz-Ramirez, he seeks

28  to have all of the firearms related expert testimony excluded.

1    With respect to the evidence pertinent to him, Mr. Cruz-Ramirez is facing firearms
2    evidence that is being offered through SFPD Criminalist John Sanchez bearing on the
3    operability of a firearm that was not linked to any charged crime, but was seized from Mr.
4    Cruz-Ramirez in July, 2008.  The Government is also seeking to introduce comparisons of
5    both shell casings and bullets (and bullet fragments) from the Juan Rodriguez killing
6    which is charged only against Mr. Cruz-Ramirez. Mr. Sanchez is said to opine that all of
7    these were likely fired by one firearm. The firearm at issue is not listed as having been
8    examined (and thus has either not been recovered or identified).

9    Criminalist G. Andrew Smith is being proposed as an expert to identify a bullet
10   recovered from a scene of a shooting on December 9, 2005 as having been discharged
11   from a .22 caliber revolver recovered that same day.  Mr. Smith is also being offered as an
12   expert to identify bullets and casings recovered from the scene of a murder (the February
13   19, 2009 shooting of Mr. Frias, and two others) as having been fired from a .9 mm
14   recovered on October 28, 2009 (expert disclosure at p.270).

15   Criminalist Mark Proia is also being offered to link guns recovered during the
16   investigation with three separate shootings, all of them murders (expect disclosure at 248).

17   The defense does not yet have a number of materials central to understanding how
18   the expertise at issue was applied in this case; what identification criteria or theories were
19   used; what Laboratory standards were applied, etc. As demonstrated below, these are
20   major problems in the Government's approach to this subject matter. The Government has
21   been asked to provide the relevant material more than once–and motions filed in this Court
22   have sought it as well.

23   **<u>There have been significant changes in the analysis of the issues presented</u>**
**<u>since this court ruled that some firearms expertise can be admitted</u>**
24

25   This Court has familiarity with firearms evidence having presided over proceedings
26   related to motions to exclude firearms evidence litigated in 2006 and 2007 in *U.S. v. Diaz,*
27   *et al., supra* CR-05-00167 WHA. The undersigned Philipsborn filed one of the motions at
28   issue in *Diaz*.  In February, 2007, this Court issued an Order granting in part and denying

1  in part motions to exclude firearm identification evidence.  This Court chose to allow such

2  evidence in the *Diaz, et al.*, case, with some limitations.  Those limitations were that: (a)

3  experts could not testify to their conclusions 'to the exclusion of all other firearms in the

4  world'; (b) they could only testify that a particular bullet or cartridge case was fired from a

5  particular firearm to a 'reasonable degree of certainty in the ballistics field.'[1]

6       Other courts have been less impressed with firearms evidence than was this Court,

7  and controversies continue to exist–particularly with respect to how firearms related

8  criminalists can phrase and describe their opinions if and when they are allowed to give

9  then.  Even before this Court's ruling in *Diaz et al.,* Judge Saris of the Federal District

10 Court in Massachusetts had questioned whether it was possible to achieve a 'perfect

11 match' between a test-fired bullet and an evidence bullet in a given case.  *U.S. v.*

12 *Monteiro*, 407 F.2d 351, 362-3 (D.Mass. 2006).

13      After this Court's ruling in *Diaz*, Judge Rakoff of the Southern District of New

14 York decided *U.S. v. Glynn*, 578 F.Supp.2d 567 (S.D.N.Y.).  Judge Rakoff wrote a

15 decision that has been commented upon in literature pertinent to firearms expertise.

16 Having considered a number of prior rulings, including this Court's in *Diaz* (and

17 *Monteiro*), Judge Rakoff dismissed the contention that ballistics identification analysis is a

18 'science'.  The *Glynn* court noted that even the Government "... did not seriously contest

19 the Court's conclusion that ballistics lack the rigor of science and that, whatever else it

20 might be, its methodology was too subjective to permit opinions to be stated to 'a

21 reasonable degree of ballistic certainty'."  *Id*. at 571-572.[2]  It should be noted that here, in

22 Mr. Cruz-Ramirez's case, the Government has avoided dealing with the position that it

23 took in *Glynn*. Indeed, one is hard pressed to read the Government's disclosures on

24 firearms expertise and glean any information about what body of law, or firearms-related

---

[1] *Diaz,* February 12, 2007 Order at p.22.

[2] The ruling in *Glynn* was cited in a subsequent case, *U.S. v. Willock* 682 F. Supp. 2d 512, 535 (D. Md, 2010), where the parties agreed that the firearms examiners would not testify about levels of certainty.

1   literature, is being referenced in seeking to introduce experts on firearms and firearm

2   evidence.  These are matters that should be addressed here.

3        In addition, since this Court last looked into this area of endeavor, a major

4   development has occurred–which was commented upon by the U.S. Supreme Court in

5   restricting the use of testimonial hearsay in the form lab reports of certain kinds. In

6   *Melendez-Diaz v. Massachusetts,* ___U.S.___; 129 S. Ct 2527, 2536-7 (2009) specifically

7   noted that in 2009, the National Research Council (hereafter NRC), whose members are

8   chosen from the National Academy of Sciences among other National Academies,

9   published *Strengthening Forensic Science in the United States* in 2009 (hereafter 'NRC

10  report'). This book length report received national attention. It reviewed all major aspects

11  of the forensic sciences. The *Melendez-Diaz* Court was not concerned with firearms

12  evidence - however, the NRC report did deal with firearms and toolmark examination

13  evidence.  The NRC pointed out the following about firearms and toolmark identification:

14  "Sufficient studies have not been done to understand the reliability and repeatability of the

15  methods". *Id.* at p.154. The report went on to state that: "...the scientific knowledge base

16  for toolmark and firearms analysis is fairly limited". *Id.* at p.155.  Arguably, these

17  positions/conclusions, reached in 2009,  undermine at least some of the positions taken

18  and conclusions stated by this Court in its 2007 *Diaz* firearms related Order

19       These points are made because they demonstrate why the Cruz-Ramirez defense is

20  arguing that it is time to re-examine <u>this</u> Court's ruling in *Diaz*. *Glynn*, and the NRC

21  report, form part of the basis on which the Cruz-Ramirez defense moves for a hearing to

22  determine not only the admissibility of any alleged expert testimony on firearms

23  identification, or firearm-related evidence, but also the circumstances under which such

24  evidence, if it is permitted at all, can be provided.

25       The New York court's conclusion in *Glynn* was that not only did ballistics lack "...

26  the rigor of science, but [it] suffers from greater uncertainty than many other kinds of

27  forensic science." *Id.* at 574-575. At least some of the most recent decisions on the subject

28  have indicated that this Court's approach in *Diaz* (to allow at least some level of 'ballistic

1    certainty' to be referenced) should not be employed.[3]

2     Especially given that, at this point at least, the Government has not described the

3    theory of identification, and methodologies, that are the basis for the proffered testimony,

4    the Court should rule that the proposed evidence <u>cannot</u> be introduced. If the Government

5    is able to amplify its proffers by referencing the technical basis for the expertise, then the

6    Court should consider whether that basis renders any of the expertise admissible in this

7    case. The defense emphasizes that in *Diaz, et al.,* at least, the Government had made the

8    effort to obtain SOPs, and a great deal of literature that was the subject of review and

9    litigation.  The Government has not seen its obligations similarly in this case. And even if

10   the Government does manage to provide the necessary basic disclosures, the substance of

11   the issues presented is framed by the NRC report. The NRC report indicates that the

12   weight of scientific and technical opinion today is that verifiability is a problem in this

13   field of technical endeavor. It is a field that, in the end, relies, on individual observations

14   and judgements, not easily subjected to verification and replication.

15    II. **DISCUSSION AND AUTHORITIES**

16    Toolmark identification, and firearms and firearm related identification, procedures

17   have been described in case law as areas of expertise.  *U.S. v. Williams*, 506 F.3d 151,

18   161-162 (2nd Cir. 2007), upholding a ruling admitting such evidence without a hearing,

19   while noting that: "... [w]e do not wish this opinion to be taken as saying that any

20   proffered ballistic expert should routinely be admitted."  These are, however, areas of

21   technical rather than scientific expertise.  The identification process has traditionally been

22   based mainly on observation, common sense, and on the job training.  It falls in a category

23   of endeavor and expertise like that described in *Kumho Tire Company v. Carmichael* 526

24   U.S. 17 (1999) [hereafter *Kumho*], where the expert described how vehicle tires are

25   manufactured, how they wear, and what deficiencies in their design may lead to failure.

26   The Federal Rules of Evidence including Rules 102 and 702 are applied to scientific

27

28    [3]As noted in footnote 2, above, it appears the Government did not dispute the notion that a level of 'reasonable ballistic certainty' should not be used in either *Glynn* or *Willock*.

MPA iso Motion to Exclude Firearms Related Expert Testimony  6

1  processes through the gatekeeping function described in *Daubert v. Merrell Dow*

2  *Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) [hereafter *Daubert*].

3         Federal Rule of Evidence 102 provides that:

4              These rules shall be construed to secure fairness in administration,
               elimination of unjustifiable expense and delay, and promotion
5              of growth and development of the law of evidence to the end
               that the truth may be ascertained and proceedings justly
6              determined.

7  In context, the Supreme Court described 'scientific' in *Daubert* as follows:

8              The adjective "scientific" implies a grounding in the methods
               and procedures of science.  Similarly, the word "knowledge"
9              connotes more than subjective belief or unsupported
               speculation...Of course it would be unreasonable to conclude
10             that the subject of scientific testimony must be "known" to
               a certainty; arguably, there are no certainties in science...
11             but in order to qualify as "scientific knowledge", an inference
               or assertion must be derived from the scientific method.

12

13  *Daubert, supra*, 509 U.S. at 585.

14         The *Daubert* court observed that: "[o]rdinarily, a key question to be answered in

15  determining whether a theory or technique is scientific knowledge that will assist the trier

16  of fact will be whether it can be (and has been) tested...." *Id.* at 592-593.  Delving into the

17  scientific literature, the court cited with approval Hempel's statement that: "[T]he

18  statements constituting a scientific explanation must be capable of empirical test...."

19  Hempel, *Philosophy of Natural Science* 49 (1966), quoted in *Daubert* at 592-593.  As

20  explained above, the NRC has expressed the concern that, as of 2009, some of the theories

21  of firearms and toolmark examination are not capable of such empirical testing - or, better

22  put, there is no currently available empirical support for the theories as scientifically

23  based.

24         These same general principles were also discussed in *Kumho, supra*, where the

25  question before the Supreme Court was, in part, whether the *Daubert* analysis applied to

26  the approach that a court should take on technical or specialized knowledge not

27  specifically rooted in scientific principles, or not subject to empirical verification.  The

28  Court decided that criteria related to scientific expertise were also applicable to areas of

1   technical expertise.

2       The expertise must be established in a reliable manner. To assess this reliability, it

3   must be testable and should have been tested. Also, the knowledge must have been

4   subjected to peer review and publication. There should be  known or potential error-rates

5   for the field of knowledge. Furthermore, the standards regulating how the technique is

6   applied should be both available, and followed, where evidence based on the technique is

7   being offered.  Also, the court must be able to ascertain how widespread the acceptance of

8   the principles of the expertise are.

9       As applied to a firearms or toolmark examiner, the combination of the case law, and

10   Federal Rules of Evidence make clear the following: the proffered experts must qualify

11   under rules pertinent to the testimony of experts who rely on either the methods applicable

12   to scientific endeavor or to their specific field of technical expertise.  Under FRE 702, in

13   order to permit the experts to testify, their testimony must be "based upon sufficient facts

14   or data", and be "... the product of reliable principles and methods", where "... the witness

15   has applied the principles and methods reliably to the facts of the case."  See FRE 702.

16   That is where one aspect of the deficits are in this case. The other, as discussed in the NRC

17   report, is that verifiability and reliability cannot currently be achieved in this field.

18       A.    **There are questions about the technical knowledge specific to firearms**
19                   **evidence and firearms-related evidence that require the Court to assess the expertise in a case-specific context.**

20       Firearms and toolmark examination is dependent on an individual's ability to

21   recognize and compare the characteristics of specific toolmarks. The reviewing trial court

22   must thus assess the proffered examiner's background, experience and methodology. It

23   should also learn how often that examiner has been wrong in the past in the application of

24   the methodology.  *U.S. v. Santiago*, 199 F.Supp.2d 101, 112-113 (S.D.N.Y. 2002).

25       The theory of identification of firearms evidence revolves around the significance,

26   in a given case,  of characteristics that firearms examiners observe and then describe,

27   which are viewed as the basis of the identification (or exclusion) of the firearm (or

28

1  bullet/bullet fragment or cartridge case).[4]

2  The characteristics are categorized into three groups: class, individual, and
3  subclass. The AFTE Glossary, published by the Association of Firearms and Toolmark
4  Examiners (AFTE),  generally defines <u>class characteristics</u> as intentional or design
5  characteristics common to a particular group of items (lands and grooves, for example, in
6  the barrel of a firearm). [5]

7  <u>Individual characteristics</u> are marks caused by the random imperfections or
8  irregularity of tool surfaces. The assumption is that these are unique to that tool.

9  <u>Subclass characteristics</u> are discernable surface features of an object which are
10  more restrictive than 'class characteristics' in that they are produced as an artifact of the
11  manufacturing process.

12  For example if a bullet is found at the scene, its weight and relative size (or caliber)
13  are class characteristics. Striated marks left on the bullet by the process of passing through
14  the barrel of a gun may be identified as individual characteristics. The assumption is that
15  these individual characteristics can help include or exclude a particular firearm as having
16  discharged the bullet in question.  The examiner then further examines the bullet to see
17  whether it is possible to ascertain subclass characteristics, which can be due to an
18  imperfection, or wearing, of a manufacturing too used to manufacture the firearm in
19  question. These subclass characteristics, according to one of the theories of firearms
20  identification, are what assist in the fine-tuning of the identification, and lead to the
21  potential for an accurate identification of a particular weapon as having fired the case
22  bullet.

23  //

24

25     [4]This point is made based on the undersigned lawyer's past experience with the subject at
26  issue, including his participation in the *Diaz et al.*, *supra,* hearings on the issue. Since no current
   disclosure of methodology employed in this case has been made yet (no SOPs, etc), this
27  discussion is rooted in prior experience and information rather than current case material.

28     [5]The question of whether the AFTE glossary and Theory of Identification are at issue in
   this case can only be answered by further discovery. They were at issue in *Diaz.*

1   The rifling impressions found on the bullet can also be examined first to see what

2  class (six lands and groves, right twist) and individual characteristics (striations pressed

3  into the land and groove impressions) they display. They can establish a means to narrow

4  the field of possible firearms to consider–since the manufacturing characteristics of a

5  firearm are generally known, including the shape of the barrel (conventional/polygonal),

6  and the width and direction of twist of lands and groves.

7   If an evidence firearm (seized or found during the investigation) is available, test

8  firings are done to obtain exemplars of individual characteristics on test bullets and

9  casings. That produces some 'known' exemplars that can the be compared to any bullets or

10  casings retrieved during the investigation.  The 'unknown' bullets in evidence can be

11  examined side by side with the 'knowns'  to see whether they match the pattern of rifling

12  (class characteristics) and whether the fine, and supposedly unique, striations contained in

13  the barrel of a questioned firearm have marked both the known and unknown bullets

14  similarly. The examiner's opinion of the 'match' is based on the assumption that the

15  observed microscopic striations or scratches resulting are "unique" to one firearm.

16   Where no firearm is available here, firearms examiners draw inferences about the

17  shell casings or bullet fragments they are observing.  In some cases, having no firearm

18  available for the attempted identification is less problematic than in other cases.  Certain

19  weapons are known to have barrels that contain either twisting land and grooves to direct

20  bullets out of the barrel (and thus leave impressions that twist the predicted way on a

21  bullet), or in the case of other firearms (Glock pistols for example) the barrel has a

22  polygonal shape that leaves a specified type of impression on a bullet that has been fired

23  through/by/via a weapon with a polygonal barrel.[6] Polygonal barrels do not leave easily

24  individualized marks on bullets–which reduces the utility of the 'traditional' approach to

25  identification where such firearms are at issue.

26

27   [6]This presents a unique problem, as was noted during the *Diaz* hearings–because
    polygonal barrels do not leave the kinds of marks and striations on a bullet that allow
28  discrimination between one such barrel and another. Haag, L.C. *Identifiable Bullets from Glocks
    in 60 Seconds,* AFTE.org/2003 Training. Haag is a former President of AFTE.

Also, when seeking to identify the manufacturer of a gun that discharged a certain shell casing, firearms examiners will make reference to the firing pin impressions, and the extractor mechanism marks, that are known to be produced by weapons of given manufacturers. A few weapons have highly distinctive firing pins that are rectangular, for example, which would eliminate from consideration other firearms that have oval or elliptical pins as the source of the shell casing. Individualizing the impressions left by breach faces, or firing pins, can be rendered difficult if the firearm is the product of recent, high tech, manufacturing techniques.

Even believers in toolmark identification theory note that the modern manufacturing processes that create tools (like firearms) are such that several given firearms from a manufacturer may not have easily distinguishable characteristics, which are important to the examiner. This means that there is an *error rate* created by the fact that some weapons cannot be individually identified. Moran, *A Report on the AFTE Theory of Identification and Range of Conclusions for Tool Mark Identification and Resulting Approaches to Casework*, 34(2) AFTE Journal 227, 227-228 (2002). Indeed, some of the AFTE theory of identification has been refined, if not changed, because of the recognition that the methodology of examination initially developed might not lead to the proper conclusion that a given firearm was the source of a toolmark found on an object like a bullet or a casing. This was done because of the theory of 'uniqueness'.

The theory of uniqueness as applied to firearm evidence identification is dependent on the notion that each firearm has unique characteristics. As Dr. Richard Saferstein puts it in his widely used textbook, *Criminalists: An Introduction to Forensic Science* (9th Ed, 2007): " No two rifled barrels, even those manufactured in succession, have identical striation markings. These striations form the individual characteristics of the barrel."*Id at* p. 463. The theory extends to all aspects of firearms manufacturing–that no two firing pins, breech faces, or extractor mechanisms, are really the same - and thus that each leaves a truly unique imprint or mark. There is ample literature demonstrating the efforts made, in various eras of firearms making, to test this theory. As noted, some of the manufacturing

techniques used today (polygonal barrel shapes; current metal hardening techniques; barrel coating procedures) have opened to question the utility of the theory to the point to which some firearms evidence is not completely subject to it - even by believers in the theory.[7]

The validity theory of uniqueness also depends on there being some way to observe and reliably document the uniqueness as demonstrated in any given case. Thus, as Saferstein explains, usually, a firearms examiner gets one known bullet from a test firing, and mounts it under a comparison microscope. The unknown bullet(s) from the crime scene are then examined by the examiner, and are mechanically rotated until the examiner finds some striations or marks that are 'unique' and appear to match. The more 'points of agreement' the better.

But the question of whether one can find 'agreement' randomly is a difficult one for firearms examiners. In other words, you can, according to some critics, come up with 'agreement' based on the examiner's subjective view of the evidence that might not be objective demonstrable–or that might be disagreed about by another examiner. Thus, the assumption of uniqueness and its utility in ascertaining the reliability of firearms evidence is questionable. It is an assumption the validity of which has yet to be demonstrated in a scientific way, notwithstanding a fairly zealous defense of the assumption. As the 2009 NRC report points out, the scientific basis for the assumptions made by firearms and toolmark examiners is still lacking. *Strengthening Forensic Science*, *supra,* at pp. 154-155.

Even more basically, in order to cross the threshold of an acceptable examination process, the Government needs to demonstrate that the examiner it is intending to use as an expert has employed a generally accepted approach. Currently, the professionally accepted approaches used by firearms examiners are either endorsed by the Scientific Working Group for Firearms and Toolmarks (SWGGUN), or by the Association of Firearm and Toolmark Examiners (AFTE)–regardless of laboratory affiliation. Some Laboratories specifically reference a particular authoritative guide (like the AFTE Glossary) as guiding its work. The reliability of the resulting examination process is

---

[7]As noted above, this is the case with polygonal barrels.

dependent on (a) adherence to standards proven to be accepted and reliable (assuming a trained examiner); (b) proper use of the methods, independent review of which requires sufficient documentation and verifiability) and (c) validity and reliability (as required in Rule 702).

As noted throughout this pleading, the NRC report has focused on the issue of how verifiable the firearms examiner's opinion is likely to be, and whether claims of verifiable expertise are accurate. Even before the NRC report, it had been noted that there is a lack of statistical data to permit the understanding of the validity criteria used to distinguish between matches and exclusions (identity and non-identity) with a reasonable (or acceptable) degree of certainty. Biasotti, *The Principles of Evidence of Valuation as Applied to Firearms and Tool Mark Identification*, 9 Journal of Forensic Sciences 428, 430 (1964); also Bunch, *Consecutive Matching Striation Criteria: A General Critique*, 45 Journal of Forensic Science 955 (2000).

**B.    Is firearms examination and identification the result of a reliable process?  The NRC cautions that it is not scientific or easily statistically verifiable.**

There are those who have carefully studied firearms and toolmark identification as an area of expertise who strongly dispute that it meets the FRE 102 and 702 criteria. They question whether there is a validated, systematized, approach to firearms (or bullet/casing) identification.  See, for example, Schwartz, *A Systematic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification*, 6 Columbia Science and Technology Law Review 2 (2005).  Professor Schwartz prompted firearms and toolmark examiners to justify theirs as a valid and reliable area of expertise when she published the just cited article. In response, firearms examiners sought to demonstrate the scientific basis for their work. See, Nichols, *The Scientific Foundation of Firearms and Toolmark Identification–A Response to Recent Challenges*, California Association of Criminalists' News, 2006.  According to this article by Nichols (which seeks to respond to the critique offered by Professor Schwartz), the expertise applied in firearms examination <u>is</u> systematized, and based on scientific principles (specifically the AFTE methodology), and

1   that where proper methods are used, and documented, the expertise is a scientific process.[8]

2   But even this view requires that the examiner's work be subject to verification.

3          Significantly, the NRC had access to the Schwartz/Nichols dialogue when it

4   reached the conclusion, in 2009, that "...the scientific knowledge base for toolmark and

5   firearms analysis is fairly limited". *Strengthening Forensic Science*, *supra*, at p. 155.

6   Indeed, the NRC report cites Nichols, while noting that: "...the decision of the toolmark

7   examiner remains a subjective decision based on unarticulated standards and no statistical

8   foundation for estimation of error rates." [fn. omitted]  *Id.* at pp. 153-154.

9   **C.      To get close to verifiability, there have to be clearly defined and verified**
            **methods, procedures and documentation - some of which are still**
10           **missing**.

11          The question of whether verifiable and reliable methods were applied to each

12   examination in this case (particularly where there is a match or a relevant exclusion)

13   remains to be answered.  Because of the lack of references to generally accepted standards,

14   and lack of documentation of the testing procedures and processes, it is not possible to

15   obey *Daubert's* command that the "... focus, of course, must be solely on principles and

16   methodology, not on the conclusions they generate." *Daubert, supra,* 509 U.S. at 595. [9]

17   As a further result, it is not possible in this case to assess whether the proposed firearms

18   evidence identification testimony is reliable, and it is clear that it risks prejudice and

19   confusion within the meaning of FRE 403.  *General Electric Company v. Joiner*, 522 U.S.

20   136, 148-149 (1997).  (Breyer, J., concurring.)  As the *General Electric* court noted there

21   are instances in which a "... court may conclude that there is simply too great an analytical

22   gap between the data and the opinion offered [citations omitted]." *Id.* at 146.[10]

23

24   _____

25          [8]Indeed, the AFTE and its members have devoted time recently to demonstrating to one
     another that theirs is a scientific endeavor. Some recent AFTE meetings have been devoted to
26   dealing with *Daubert* challenges.

27          [9]Some of this, of course, may change if more discovery, including SOPs and
     methodological statements are provided.
28

          [10] In a death penalty case, the lack of reliability is also an Eighth Amendment issue.

MPA iso Motion to Exclude Firearms Related Expert Testimony                                          14

1     Under the circumstances, the Cruz-Ramirez defense "... raises a material dispute as

2   to the admissibility of expert scientific evidence [here], [and that] the district court must

3   hold an *in limine* hearing (a so-called *Daubert* hearing) to consider...and make findings

4   about the soundness and reliability of the methodology employed by the scientific experts

5   [citations omitted]." *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1318-1319

6   (9th Cir. 1995).

7     In interpreting the *Daubert-Kumho* standard, several circuits have noted that "any

8   step that renders the analysis unreliable... renders the expert's testimony inadmissible." *In*

9   *re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 745 (3rd Cir. 1994).  The United States

10   Supreme Court has found that, notwithstanding the qualifications of the expert, the

11   expert's testimony may fail to be admissible if "there is simply too great an analytical gap

12   between the data and the opinion offered." *General Electric Company v. Joiner, supra*,

13   522 U.S. 136, 146.

14     As the literature on toolmark examination demonstrates, proper application of the

15   theories of identification is essential. See Flynn, *Toolmark Identification,* 2 Journal of

16   Forensic Sciences 95, 102 (1957);  accord Giannelli and Imwinkelried, *Scientific Evidence*

17   633 (3d ed. 1999).

18     While it may exist, defense requests for pertinent foundational information are still

19   pending. No documentation has been provided about exactly what methodology,

20   nomenclature, match and non-match criteria have been used here,. See, for example,

21   Biasotti and Murdock, "*Criteria for Identification,"* 16 AFTE Journal 16 (1984) at p.19.

22   Indeed, the absence of specific documentation, or of a statement of criteria for opinions,  is

23   puzzling in view of the fact that there is literature published by reputable scientists noting

24   that little evaluation of the validity of the underlying science of toolmarks and firearms

25   identification has occurred in court.  Faigman, *et al.*, *Firearms and Toolmark*

26   *Identification: Legal Issues*, Chapter 29, 3 Modern Scientific Evidence (2002); accord,

27   NRC report, *supra*.

28   //

**D.     It is a violation of Due Process and the Fair Trial Right under the Fifth Amendment, of confrontation and cross-examination under the Sixth Amendment, and the Eighth Amendment reliability requirement, for the Government to be permitted to call expert witnesses to testify where these witnesses will rely mainly on a conclusory report, especially where their work papers and documentation are insufficient to demonstrate adherence to the scientific process.**

It is likely that none of the criminalists and technicians called to testify about given firearms and/or bullet and casing examinations will remember them specifically. Testimonial hearsay concerning analytical science testing results cannot be introduced in a criminal trial in violation of the accused's right to confrontation. *Melendez-Diaz v. Mass.*, *supra*, ____U.S.____; 129 S.Ct. 2527; *Crawford v. Washington*, 541 U.S.36 (2004).

The U.S. Supreme Court noted in *Daubert, supra*, that "... vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate methods of attacking shaky but admissible evidence." *Daubert, supra*, 509 U.S. at 596. But the defense cannot cross-examine a witness without a present memory of past events.  That was the whole point of *Crawford v. Washington*, and the outlawing of the use of police reports, traditionally prepared in preparation of and for litigation, as a basis for a conviction.

Professor Imwinkelried, an acknowledged expert in the field of forensic sciences, and the legal standards for the admission of scientific evidence (and one of the authors of a previously cited standard work on forensic sciences), noted that: "For several decades there has been mounting evidence of a substantial margin of error in expert analysis. Numerous proficiency studies of laboratories have documented that expert analysis is far from infallible."  Imwinkelried, "*Flawed Expert Testimony: Striking the Right Balance in Admissibility Standards*" 18 ABA CRIM.JUST. 28, 29 (2003). The concern here is that the reading of the result of a long ago forgotten examination process by an analyst or technician who has no present recollection of his/her work is an unreliable process.

//

//

//

1

**CONCLUSION**

2      For the reasons stated here, this Court must exclude the testimony of the identified

3  firearms experts.  If the Court is not inclined to do so, it should order a hearing at which

4  the analysts, criminalists, and scientists are called to testify outside of the presence of the

5  jury so that this *Daubert/Kumho* challenge can be determined.  Also, the Court should

6  order the Government to provide the documentation necessary, including SOPs;

7  identification criteria; Laboratory procedures and methodologies; proficiency testing

8  records of the examiners in all aspects of the identification process; information about the

9  use of computer generated analyses to identify or exclude firearms; and documentation

10  about how the advent of the AFTE methodology has impacted the approach used by the

11  various firearms examiners that the Government is proposing to call.

12  Dated: June 14, 2010

13                                 Respectfully submitted,

14                                 SUSAN M. RAFFANTI
                                   JOHN T. PHILIPSBORN

15

16                                 by s/John T. Philipsborn
17                                    JOHN T. PHILIPSBORN
                                      Co-Counsel for Defendant
18                                    JONATHAN CRUZ-RAMIREZ

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I, Steven Gray, declare:

That I am over the age of 18, employed in the County of San Francisco, California, and not a party to the within action; my business address is Suite 350, 507 Polk Street, San Francisco, California 94102.

On today's date, I served the within document entitled:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE FIREARMS RELATED EXPERT TESTIMONY [Jonathan Cruz-Ramirez]**

( )   By placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at San Francisco, CA, addressed as set forth below;
(X )  By electronically transmitting a true copy thereof;
( )   By having a messenger personally deliver a true copy thereof to the person and/or office of the person at the address set forth below.

Wilson Leung
Christine Wong
Assistant U.S. Attorneys

Christopher J. Cannon, Esq.
powpowpg@aol.com

Ellen Valentik Leonida, Esq.
leonida@badamileonida.com

Harris Bruce Taback, Esq.
htaback@earthlink.net

Mark Rosenbush, Esq.
markrosenbush@mindspring.com

Martin Antonio Sabelli, Esq.
msabelli@comcast.net

Randy Sue Pollock, Esq.
pollockesq@aol.com

Anthony John Brass, Esq.
tony@brasslawoffice.com

Jeffrey M. Glenn, Esq.
sflawyers@earthlink.net

Peter Goodman, Esq.
petergoodman@earthlink.net

Brendan Conroy, Esq.
brenco4@aol.com

Ethan A. Balogh, Esq.
eab@colemanbalogh.com

John M. Runfola, Esq.
jrunfola@earthlink.net

Lidia Stiglich, Esq.
stiglich@stiglichhinckley.com

Shana Keating, Esq.
shana_keating@hotmail.com

Edward W. Swanson, Esq.
eswanson@swansonmcnamara.com

George Claude Boisseau, Esq.
boisseaugc@msn.com

Seth P. Chazin, Esq.
crimatty@earthlink.net

Nina Wilder, Esq.
ninawilder@aol.com

Linda Ann Fullerton, Esq.
lindafullertonlaw@sbcglobal.net

James Phillip Vaughns, Esq.
vaughnslaw@aol.com

Ann Carole Moorman, Esq.
ann@acmoormanlaw.com

Mark S. Goldrosen, Esq.
markgoldro@aol.com

Suzanne Adele Luban, Esq.
lubanlaw@sbcglobal.net

John J. Jordan, Esq.

1   jjordanesq@aol.com

2   Erik G. Babcock, Esq.
    erik@babcocklawoffice.com

3

4   Frank Bell, Esq.                                    Erin Crane, Esq.
    frankbell@frankbelllaw.com                          erincrane@sbcglobal.net

5   Brian P. Berson, Esq.
    brianberson@yahoo.com

6

7   Geri Lynn Green, Esq.
    gerigreen@earthlink.net

8

9

10

11

12

13

14          I declare under penalty of perjury under the laws of the State of California that the
    foregoing is true and correct.

15          Executed this 14th day of June, 2010 at San Francisco, California.

16                                     Signed:        /s/ Steven Gray
                                                      Steven Gray

17

18

19

20

21

22

23

24

25

26

27

28