1

2

3

4

5

6           IN THE UNITED STATES DISTRICT COURT

7

8           FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   UNITED STATES OF AMERICA,                    No. CR 08-0730 WHA

11                    Plaintiff,

                                                  **ORDER RE SUPPRESSION**
12        v.                                      **MOTIONS FILED BY DEFENDANTS**
                                                  **JONATAHAN CRUZ-RAMIREZ,**
13   IVAN CERNA, *et al*.                         **LUIS HERRERA, ERICK LOPEZ,**
                                                  **AND GUILLERMO HERRERA**
14                    Defendants.

15   _____/

16                              **INTRODUCTION**

17        In this RICO/VICAR prosecution, all suppression motions by the formerly death-eligible

18   defendants have now been made.  This order addresses the motions filed by defendants Jonathan

19   Cruz-Ramirez, Luis Herrera, and Erick Lopez, which were heard on December 8.  This order also

20   addresses the motion filed by defendant Guillermo Herrera, which was heard on November 29.

21        As a preliminary matter, not all motions were supported by a sworn declaration from the

22   moving defendant.  Instead, most relied solely on police records, and in a few instances, sworn

23   declarations from counsel.  Ordinarily, the moving defendant must comply with Criminal Local

24   Rule 47-2(b), which requires sworn declarations or affidavits for motions presenting issues of fact.

25   Denial of a suppression motion because the moving defendant failed to submit a supporting

26   declaration has been affirmed by the court of appeals.  *United States v. Wardlow*, 951 F.2d 1115,

27   1116 (9th Cir. 1991).

28        In some circumstances, however, it would be unfair to the moving defendant to strictly

     enforce the local rule.  For example, where the pertinent history is all known only by police

officers, defense counsel cannot be expected to obtain declarations from the officers, given their partisan role. In such a circumstance, it is sufficient for defense counsel to proffer the police reports, for it is reasonable to presume that the officers will likely testify in accordance with their own reports. Then the question arises whether a moving defendant should be afforded an evidentiary hearing to contradict the police records or the government's proffer even though the defendant himself has not proffered the requisite sworn statements to call such records into question.

Where the motion challenges a warrantless search or seizure, the burden is on the government to justify the search or to show an exception. That is, once the movant demonstrates that a warrantless search or seizure occurred, the burden shifts to the government to demonstrate a justification or exception, usually via officer declarations. Officer declarations are not always essential, for police reports relied on by the movant himself may sometimes supply the justification, at least where reports are clear and consistent. If the government makes this demonstration, the movant may nonetheless sometimes be afforded an evidentiary hearing. This will usually occur if the movant raises an issue of material fact such as via the accused's own declaration. In the absence of such a declaration, the police reports or officer declarations may "vague out" on key points, or even worse, be inconsistent, also warranting an evidentiary hearing. Fishing expeditions, based on nothing more than a hope that something may turn up once the witnesses testify are not enough to warrant an evidentiary hearing.

Where the government's opposition, at least if fully credited, meets the government's burden to justify a warrantless search or seizure or fully rebuts movant's factual assertions — based on the same police reports advanced by the movant — then there is no need for an evidentiary hearing unless the movant shows that an evidentiary hearing can be anticipated to develop facts showing the search or seizure was unlawful. The party seeking an evidentiary hearing must justify it in some meaningful way. Counsel must specify what he or she expects an evidentiary hearing will prove if allowed. If counsel asserts that certain facts can be anticipated but those facts should be known to the defendant, then the moving defendant must submit a sworn

1  declaration under Criminal Local Rule 47-2(b) specifying such facts (unless other sworn evidence

2  makes the same factual point).

3      Finally, it is the burden of the defendant to prove his legitimate expectation of privacy has

4  been violated. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978). Not all defendants submitted

5  sworn declarations, however. Notwithstanding such failures, where the record offers some support

6  for the proposition that the moving defendant had a reasonable expectation of privacy in a

7  particular location, this order entertains the substantive challenge despite the lack of a sworn

8  declaration. Where the record provides no support for an expectation of privacy in a particular

9  location or is contested, this order will not address the substantive challenge. The deadlines

10  having passed, no further re-tries will be allowed.

11                          **ANALYSIS**

12      With the foregoing in mind, the suppression motions of defendants Jonathan Cruz-

13  Ramirez, Luis Herrera, Erick Lopez, and Guillermo Herrera are ruled on as follows.

14      **1.     DEFENDANT JONATHAN CRUZ-RAMIREZ'S MOTION TO SUPPRESS (DKT. NO. 2410)**

15      Defendant Jonathan Cruz-Ramirez moves to suppress all items seized from C Street and H

16  Street in San Francisco relating to firearms, violent crimes, and gang affiliation on the basis that

17  the warrants authorizing their seizure were unconstitutionally overbroad and insufficiently

18  particular (Dkt. No. 2410).[1]  For the reasons stated herein, the motion is **DENIED**. The warrants at

19  issue were not unconstitutionally overbroad nor insufficiently particular. No evidentiary hearing is

20  necessary as the motion challenges the face of the warrant and the parties agree that no facts are in

21  dispute (Opp. 2; Reply 1).

22                  *         *         *

23      Three search warrants are relevant to the instant motion. All were applied for and executed

24  by ICE and were authorized by Magistrate Judge Maria Elena James of our district.

25      The first search warrant authorized the search of C Street for identification documents,

26  documents relating to immigration, and documents indicating habitation, ownership, and/or control

27

28      [1]  To protect the privacy of the other residents at these residences, defendant Cruz-Ramirez has
    requested that the specific addresses be omitted from the public record.

of C Street (SW0002-03).  The search warrant affidavit explained that defendant Cruz-Ramirez was residing in San Francisco at the time of the affidavit but had previously been deported seven months prior and warned that it was illegal to re-enter the United States (SW0003).  Defendant Cruz-Ramirez concedes that the search warrant contained sufficient facts to establish probable cause to believe evidence of illegal re-entry would be found at C Street and does not challenge the validity of this search warrant (Br. 5, 8; Reply 2).

When ICE agents arrived at C Street to execute the first warrant, no one was home (SW0015).  Accordingly, the agents performed a protective sweep of the premises.  During the protective sweep, a firearm was observed in a closet in plain view.  As a result, the ICE agents halted the search and ICE Special Agent Jason Red submitted an expanded search warrant application for C Street (SW0015–16).

The second, expanded search warrant sought authorization to search and seize: (1) firearms, ammunition, and indicia of firearm ownership and/or possession; (2) weapons and defensive armaments; (3) evidence of acts of violence, including blood-stained clothing or items; and (4) any and all indicia of gang membership (SW0018).  In support of this expansion, the affidavit recounted the discovery of the firearm in plain view at C Street.  The affidavit also specified that a SFPD inspector with 10 years of experience investigating criminal street gangs informed the affiant that defendant Cruz-Ramirez was a member of the San Francisco clique of MS-13 and that several homicides in San Francisco were suspected to have been committed by MS-13 members as a result of gang rivalries (SW0015).  The affidavit submitted that the discovery of the gun at C Street and defendant Cruz-Ramirez's affiliation with MS-13 established probable cause to believe that C Street contained evidence, instrumentalities, and fruits of violations of 18 U.S.C. 1962(d) (racketeering conspiracy) and 18 U.S.C. 1959 (violent crime in aid of racketeering).

The expanded search warrant was granted and executed that same evening (SW0036, SW0043).  The execution of the warrant yielded: (1) identification and immigration documents, including a green card issued to "Jose Lopez" but with defendant Cruz-Ramirez's photograph; (2)

a Makarov handgun; (3) documents containing the names "Trucha" and "Walter Palma"; and (4) and a Samsung cell phone (SW0012, SW0043, SW0047).

Four days after the search of C Street, ICE Special Agent Christopher Merendino applied for a third warrant to search H Street.  The search warrant sought: (1) identification documents; (2) immigration documents; (3) firearms, ammunition, and indicia of firearm ownership and/or possession; (4) weapons and defensive armaments; (5) evidence of acts of violence, including blood-stained clothing or items; (6) any and all indicia of gang membership; and (7) indicia of habitation, ownership, and control of the premises (SW0051).

The search warrant affidavit recounted that two prior search warrants had issued for C Street.  Additionally, it recounted that a warrant for the arrest of defendant Cruz-Ramirez for illegal re-entry had issued.  The affidavit also explained that during the second search of C Street, a woman identifying herself as defendant Cruz-Ramirez's mother stated that the room where the firearm was found was defendant Cruz-Ramirez's and she assumed the firearm belonged to him (SW0046).  She also stated that although he stayed in the room where the firearm was found, he did not live at C Street permanently and did not keep much personal property there.  Rather, he kept his property at his girlfriend's residence at H Street.  The affidavit also recounted that defendant Cruz-Ramirez was seen entering and exiting the premises at H Street.

The third search warrant for H Street was approved and the agents seized: (1) identification and immigration documents; (2) AT&T phone invoices; (3) PG&E invoices and receipts; (4) two cell phones; (5) miscellaneous foreign documents; and (6) money transfer cards and receipts (SW0079).

*          *          *

The instant motion argues that the expanded search warrant for C Street (the second warrant) and the search warrant for H Street (the third warrant) were unconstitutionally overbroad and insufficiently particular.  Specifically, the motion argues: (1) that the provisions authorizing seizure of gang-related material were insufficiently particular; and (2) the warrant applications did not establish probable cause for seizure of evidence unrelated to illegal entry.  The motion

accordingly seeks to suppress all items seized besides the Makarov handgun, identification and immigration documents, and indicia of residency.

In determining whether a warrant is overbroad and insufficiently particular, one or more of the following questions may be considered: (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued. *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986). The first factor speaks to whether a warrant is overbroad whereas the latter two address whether a warrant is insufficiently particular. *Millender v. County of Los Angeles*, 620 F.3d 1016, 1024 (9th Cir. 2010).

The warrants' gang-related material provisions were sufficiently particular. Both the expanded warrant for C Street and the warrant for H Street described the gang-related materials authorized for seizure as follows:

> Any and all indicia of gang membership, including, clothing consistent with affiliation of membership in MS-13, correspondence, rosters, diaries, address books, cellular telephones, personal computers, and personal data accessories, and indicia of possession, use, and/or control of such devices, including telephone bills.

The provisions offered sufficient guidance for the executing officers to determine which items were subject to seizure and which items were not. *See Spilotro*, 800 F.2d at 963. The warrants were not rendered "general" warrants — the officers were to seize items that specifically pertained to MS-13. Where the government cannot describe items with more particularity, warrants may authorize a search for classes of generic items. *Ibid*. Here, the nature of the evidence sought was not amenable to more particular description.

The warrants were similarly not overbroad in authorizing the seizure of items unrelated to illegal re-entry. The affidavits established that defendant Cruz-Ramirez was a suspected member of MS-13 and that MS-13 members were suspected to have committed several homicides. Importantly, the affidavits also specified that the Makarov handgun — a semiautomatic weapon — was found where defendant Cruz-Ramirez resided. The affidavits also articulated that the affiants

believed that evidence of racketeering conspiracy or violent crimes in aid of racketeering would be found at C Street and H Street. Taken together, these details supported probable cause for the warrant provisions seeking evidence of violent crime and gang membership. In *Millender*, the warrant application did not establish that the crime being investigated — domestic violence — was at all related to the defendant's gang membership. Here, however, the crimes being investigated — participation in racketeering conspiracy and violent crime in aid of racketeering — were distinctly gang-related. Although "[m]erely being a gang member or having gang ties is not a crime in California," probable cause was not solely based on defendant Cruz-Ramirez's alleged gang affiliation. *See Millender*, 620 F.3d at 1031. Probable cause was based on the fact that a number of homicides were suspected to have been committed by the gang he allegedly belonged to and a semi-automatic weapon was found at his residence.

In any event, the officers' reliance on the Judge James' probable cause determination and on the technical sufficiency of the warrant was objectively reasonable. *See United States v. Leon*, 468 U.S. 897, 923 (1984). The exclusionary rule is to be applied where it results in appreciable deterrence of deliberate, reckless, or grossly negligent conduct. *Herring v. United States*, 555 U.S. __, 129 S. Ct. 695, 700–02 (2009). Here, there is no indication that the officers were deliberate, reckless, or grossly negligent in believing Magistrate Judge James' probable cause determination was valid. The executing officers were reasonable in believing that there was probable cause for the provisions authorizing the search seizure of gang-related materials. No appreciable deterrent effect would be achieved by suppression.

### 2. DEFENDANT LUIS HERRERA'S MOTION TO SUPPRESS (DKT. NO. 2418)

Defendant Luis Herrera moves to suppress evidence seized from the search of cell phones seized from his person on March 4, 2009 (Dkt. No. 2418). In the alternative, he seeks a *Franks* hearing. For the reasons stated herein, the motion is **DENIED**. The motion failed to make the preliminary showing required to obtain a *Franks* hearing or to exclude the evidence seized.

\*        \*        \*

The warrant at issue was signed by Superior Court Judge Lisa Novak and authorized the search and seizure of records stored in two cell phones recovered from defendant Luis Herrera and

the residences of various individuals not charged in this action (S3000185). The affidavit in support of the search warrant application was authored by Daly City Police Department Detective Gregg Oglesby (S3000190–98). The affidavit described the underlying events as follows.

In February 2009, two men approached a car near the Daly City BART station and fired shots into it — killing one passenger and wounding two others. A .380-caliber handgun and a 9mm firearm were used in the attack. A witness to the shooting reported that the shooters fled the scene in a white vehicle with a license plate number beginning with "4HOB." The morning after the shooting, a stolen silver Honda with the license plate number "4HAB465" was recovered in San Francisco.

During a traffic stop about two weeks after the shooting, SFPD officers recovered a Lorcin .380-caliber semi-automatic pistol from a stolen black Honda carrying defendant Luis Herrera, Audenis Molina, Wilson Villalta, and Julio Hernandez. The pistol was loaded with .380-caliber CBC ammunition — a Latin American brand of ammunition uncommon in the United States and the same type of ammunition that had been used in several Sureño shootings in years prior. All passengers were arrested. Incident to the arrest, two cell phones were seized from defendant Luis Herrera — a silver/black Kyocera phone and a black Motorola phone. Later, SFPD Criminalist Mark Proia concluded that the spent rounds and shell casings recovered from the Daly City crime scene matched the .380-caliber semi-automatic pistol recovered from the traffic stop.

About two months after the shooting, Detective Oglesby spoke with SFPD Sergeant Nick Chorley, who had interviewed a witness to whom defendant Luis Herrera allegedly confessed involvement in the shooting. Defendant Luis Herrera allegedly stated that he had been the driver in the Daly City BART shooting. He also allegedly told the witness that defendant Danilo Velasquez and Jaime Balam were the two shooters. Sergeant Chorley also provided Detective Oglesby with "loose translations" by SFPD Sergeant Mario Molina (a native Spanish speaker) of a number of jail phone calls. According to Sergeant Molina, defendant Luis Herrera and Wilson Villalta made "references" to an Uzi firearm during the calls — the same type of firearm used during the Daly City BART shooting. They also talked about moving the firearm to different locations to evade seizure by law enforcement.

The search warrant application included a supplemental affidavit by Sergeant Chorley (S3000200–05). The supplemental affidavit specified the details of the vehicle stop and recounted admissions made by Julio Hernandez (a/k/a Julio Castro) that the passengers (including defendant Luis Herrera) were looking to shoot Norteños when they were arrested. Julio Hernandez also identified Wilson Villalta as "Crimen" and defendant Luis Herrera as "Killer." Sergeant Chorley recounted that although defendant Luis Herrera had no previous gang related arrests and denied he was a gang member, Sergeant Chorley believed he was an active participant in MS-13. To support this conclusion, the affidavit pointed to: (1) the fact that defendant Luis Herrera's brother, Guillermo Herrera, was an indicted MS-13 member; (2) Julio Hernandez's interview; (3) defendant Luis Herrera's association with a documented gang member (Villalta); and (4) the conspiracy of the car passengers to assault Norteños. Sergeant Chorley also noted that defendant Luis Herrera was recently a victim of a robbery committed by Norteños and this may have motivated the group's mission to attack Norteños on the night in question.

*       *       *

As an initial matter, defendant Luis Herrera did not submit a declaration establishing his expectation of privacy in the two cell phones seized from him. The undisputed record, however, specifies the cell phones were seized from Luis Herrera's person incident to his arrest (S3000201). Accordingly, Luis Herrera had a reasonable expectation of privacy in the contents of the seized phones as his physical possession of the cell phones created a reasonable expectation of privacy in their contents. *See United States v. Zavala*, 541 F.3d 562, 577 (5th Cir. 2008); *United States v. Chan*, 830 F. Supp. 531, 534 (N.D. Cal. 1993).

The motion asserts that the search warrant was invalid because the search warrant affidavit contained knowing omissions or misrepresentations that were material to the showing of probable cause. Specifically, the motion challenges Detective Oglesby's statements that the jail calls contained "references to an Uzi firearm" and "talk about moving the gun to different locations in an effort to avoid its seizure by law enforcement" (S3000197). These statements are alleged to have improperly impressed Judge Novak with the idea that the jail call speakers made explicit references to firearms and an Uzi when in fact the jail calls only referred to *code words* for guns

and an Uzi ("suzie" and "girl") (S3000171, 229, 270).  Defendant Luis Herrera argues this was a *Franks* error because it did not allow Judge Novak to determine for herself whether to credit the claim that the code words referred to firearms.

A *Franks* hearing is warranted where the defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155-156 (1978). Even if defendant Luis Herrera was able to prove that Detective Oglesby knowingly, intentionally, or recklessly failed to specify that the literal words "firearm" and "Uzi" were not used in the calls, the motion still fails.  Even if the references were stripped from the Oglesby affidavit, the affidavit still established probable cause to search.  The Oglesby affidavit and the Chorley supplemental affidavit recounted that: (1) defendant Luis Herrera was arrested in the same stolen vehicle from which the suspect weapon was recovered; (2) defendant Luis Herrera confessed to an informant that he drove the vehicle to the scene of the attack; and (3) a co-arrestee admitted that the arrestees were driving around with the intention to shoot Norteño gang members.  These facts establish a sufficient probability that under the totality of the circumstances the cell phones may have yielded evidence relevant to the Daly City BART homicide.  *See Illinois v. Gates*, 462 U.S. 213, 238–39 (1983).  Although the motion points out that a warrant should not issue on the basis of an informant's untested, uncorroborated statements alone, that is not the situation here.  Here, the totality of the circumstances evinced that Luis Herrera was somehow involved or knew about the homicide such that search of the cell phones in his possession would likely have yielded evidence of a crime.[2]

---

[2] Because probable cause could be found even if the objected-to material was excised, there is no need to address whether *Herring v. United States*, 555 U.S. __, 129 S. Ct. 695 (2009), would bar application of the exclusionary rule in this case.

**3.** **DEFENDANT ERICK LOPEZ'S MOTIONS TO SUPPRESS**

**A.** **Search Warrant of 1753 Fulton Street (DKT. NO. 2530)**

Defendant Erick Lopez moves to suppress evidence seized as a result of an execution of a search warrant for 1753 Fulton Street in San Francisco on April 3, 2008 (Dkt. No. 2530).[3] Specifically, defendant Lopez seeks to suppress the following items seized pursuant to the warrant: a social security card; a CD case with gang graffiti; indicia and a citation in his name; and a gang-related magazine. For the reasons stated herein, the motion is **GRANTED**. Although the motion fails to demonstrate that the pre-search "seizure" of 1753 Fulton Street was unreasonable, the search warrant was overbroad and the items seized pursuant to the warrant must be suppressed.

*          *          *

Defendant Lopez first contends that the officers' pre-search "seizure" of 1753 Fulton Street was violative of the Fourth Amendment and thus any fruits of flowing from the seizure must be excluded. This argument is rejected.

According to the SFPD incident report submitted by defendant Lopez and the declaration of Sergeant Dion McDonnell, the relevant facts are as follows (Dkt. Nos. 2530-2, 2696). On April 2, 2008, SFPD officers reported to 1755 Fulton Street to execute a search warrant. Upon arriving at 1755 Fulton Street, the resident informed Sergeant McDonnell that defendant Lopez lived at 1753 Fulton Street, not 1755 Fulton Street. Accordingly, the search warrant was not executed.

The officers returned to the vicinity the next day at approximately 3:30 p.m. Sergeant McDonnell met with a resident of 1763 Fulton Street who also stated that defendant Lopez lived at 1753 Fulton Street. SFPD Officer Scott Lau went to 1753 Fulton Street and spoke with a woman who identified herself as Nancy Lopez. Ms. Lopez confirmed she was defendant Lopez's mother and that he lived at 1753 Fulton. The officers entered the residence and Officer Lau and other officers stayed at the residence to "secure it and ensure that no potential evidence was disturbed" whilst Sergeant McDonnell obtained a revised search warrant. The revised warrant was signed at

---

[3] Defendant Lopez has demonstrated a reasonable expectation of privacy in 1753 Fulton Street at the time of his arrest (*see* Dkt. No. 2724-1).

4:30 p.m. and Sergeant McDonnell returned to 1753 Fulton Street by 5:00 p.m. at which time the search warrant was executed.

The parties dispute as an initial matter whether there was a pre-search "seizure" of 1753 Fulton Street. The incident report specifies that Ms. Lopez "opened the door and allowed Inspector Lau to enter" and Sergeant McDonnell's declaration and search warrant affidavit specifies that she "allowed us to enter her home" (Dkt. Nos. 2530-1, 2530-2, 2696). In addition, the government asserts that Ms. Lopez did not ask the officers to leave or otherwise object to their presence. As such, the government argues that Ms. Lopez voluntarily consented to the officers entering and remaining on the premises (Opp. 9). Defendant Lopez counters that the record does not specifically support that any consent to the initial entry was voluntary (Reply 4). Moreover, he points out that even if Ms. Lopez did consent to the officers *entering* her home, there is no indication she consented to the police *remaining* in her home until Sergeant McDonnell returned with the revised search warrant. Indeed, the scope of consent under the Fourth Amendment "is limited by the terms of its authorization." *Walter v. United States*, 447 U.S. 649, 656 (1980). There is no indication in the record that Ms. Lopez consented to the officers remaining in her home whilst Sergeant McDonnell sought a revised search warrant. As there was no warrant, it was up to the government to demonstrate consent — which it failed to do.

In determining whether a warrantless seizure of a private home pending obtaining a warrant was appropriate, however, privacy concerns must be balanced against law enforcement concerns using the following four factors: (1) whether the police had probable cause to believe that the defendant's residence contained evidence of a crime or contraband; (2) whether the police had good reason to fear that, unless restrained, the defendant would destroy the evidence or contraband before the police could return with a warrant; (3) whether the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy; and (4) whether the time period was no longer than reasonably necessary for the police, acting with diligence to obtain the warrant. *United States v. Song Ja Cha*, 597 F.3d 995, 1000 (9th Cir. 2010) (*citing Illinois v. McArthur*, 531 U.S. 326 (2001)).

Even though the pre-search "seizure" was non-consensual, the law enforcement concerns outweighed the privacy concerns implicated by "freezing" the Lopez residence for approximately one and a half hours. As discussed below, the police had probable cause to believe 1753 Fulton Street contained evidence related to defendant Lopez's unlawful possession of a .45-caliber semiautomatic handgun. Moreover, the seizure was no longer than reasonably necessary for Sergeant McDonnell to obtain the revised warrant and there is no indication in the record that the police did more than remain on the premises to ensure Ms. Lopez did not destroy any evidence that may incriminate her son. Of course, it may have caused less inconvenience to Ms. Lopez if Sergeant McDonnell obtained a revised warrant prior to the officers arriving at 1753 Fulton Street, however, it was not until the officers spoke with Ms. Lopez that it was verified that defendant Lopez indeed resided at that address.

*          *          *

Next, the motion argues that the search warrant for 1753 Fulton Street lacked probable cause, was overbroad, and insufficiently particular. Specifically, the motion argues that the search warrant affidavit only supported the search and seizure of evidence related to defendant Lopez's unlawful possession of the .45-caliber handgun and nothing more. This order agrees that the warrant was overbroad and in effect a general warrant prohibited by the Fourth Amendment. Accordingly all items seized pursuant to the overbroad provisions of the warrant must be suppressed.

The affidavit in support of the search warrant was submitted by Sergeant McDonnell. It recounted that on March 30, 2008, two known MS-13 members — defendant Erick Lopez and Edwin Ramos — had been arrested for unlawful possession of a .45-caliber semi-automatic pistol. A vehicle containing the individuals was stopped by police officers because the windows were tinted too darkly and the vehicle had no front license place. As the officers approached the stopped vehicle, defendant Lopez exited the car and ran away from the officers. The officers saw him kneel down over a gutter and try to force an object into it. Once the officers were able to take defendant Lopez into custody, they discovered that the item he had been attempting to force into

13

the gutter was a .45-caliber semiautomatic pistol. When defendant Lopez was arrested, he had a blue bandana in his rear pocket, which the search warrant affidavit asserted was MS-13's "color."

The affidavit also explained that Sergeant McDonnell believed that defendant Lopez was an active MS-13 gang member because of numerous prior contacts with him and information from confidential reliable informants. Additionally, the affidavit recounted that "gang members pass firearms amongst themselves as needed, to commit other crimes in furtherance of their (the gang members) criminal conspiracy, and to stock pile additional firearms."

The search warrant was signed by Superior Court Judge John Munter and authorized the seizure of a broad array of items:

(1) Firearms, handguns, and/or rifles capable of expelling ammunition. Gun cleaning kits, holsters, ammunition belts, targets expended (ammunition) casings, reloading equipment for ammunition, photographs of firearms, any paperwork indicating the purchase of any .45-cal firearm ammunition, or rifle, where the firearms may be stored or how the firearms were disposed of and any documents establishing dominion and control over any of the above described items;

(2) Any evidence of street gang membership, or affiliation with any street gang, such as paraphernalia making any reference to the Norteño gang . . . ;

(3) Any news clippings tending to relate details or reference to any crime or crimes of violence; any address books, lists of, or single references to, addresses or telephone numbers, any letters and/or documents, whether in actual written form or stored in electronic (computerized) manner, which make reference to membership and/or activities of any street gang. Any information about gang membership, gang rosters, members and/or graffiti regarding the writer's gang;

(4) Any audiocasettes or compact disc with gang graffiti and sometimes monikers on them, video tapes which depict gang activity such as members posing with and firing weapons, gang parties where gang members pose with weapons and flash gang signs with their hands, and make statements about their gang;

(5) Any articles of personal property tending to establish the identity of persons who have dominion and control over the premise and automobile searched . . .

In order for a search warrant to issue, the search warrant affidavit must establish probable cause. Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. A search warrant may not authorize a "general exploratory rummaging in a person's belongings." *Coolidge v. New*

1   *Hampshire*, 403 U.S. 443, 467 (1971). Accordingly, a search warrant must be sufficiently

2   particular and may not be overbroad.

3        Here, the search warrant was clearly overbroad. A warrant is overbroad when the search

4   warrant application does not articulate probable cause to seize all items described in the warrant.

5   *Spilotro*, 800 F.2d at 963; *Millender*, 620 F.3d at 1024. The search warrant affidavit only

6   established probable cause that evidence related to the unlawful possession of the .45-caliber

7   firearm would be located at defendant Lopez's residence. In no way did the affidavit support

8   search and seizure of the broad array of items listed in the search warrant. Without more, the

9   conclusory statement that "gang members pass firearms amongst themselves as needed, to commit

10  other crimes in furtherance of their (the gang members) criminal conspiracy, and to stock pile

11  additional firearms" does not articulate probable cause that contraband or evidence of a crime

12  would be found at the residence. The statement is too generalized. Unlike the search warrant

13  affidavit at issue in defendant Cruz-Ramirez's suppression motion, the affidavit does not articulate

14  the belief that MS-13 had actually committed unsolved crimes of which the search might yield

15  evidence of. Instead, the statement simply amounts to the assertion that gang members generally

16  commit crimes.

17       Indeed, the circumstances bore a striking resemblance to those in *Millender v. County of*

18  *Los Angeles*. There, the warrant affidavit established probable cause to search for materials related

19  to a domestic violence incident involving a specific firearm (a black sawed-off shotgun with a

20  pistol grip). Despite the affiant's clear description of the suspect firearm at issue, however, the

21  search warrant authorized the search and seizure of a broad swath of firearms-related items. Our

22  court of appeals found that this rendered the search provision overbroad. *Millender*, 620 F.3d at

23  1028. Similarly, here, the affidavit established probable cause relating to the .45-caliber firearm,

24  but did not establish probable cause to seize firearms-related material unrelated to the suspect

25  weapon.

26       Additionally, the *Millender* decision noted that the gang-related provision of the warrant

27  was overbroad in that the underlying crime being investigated was not gang-related. Although the

28  affidavit asserted defendant Lopez was allegedly a gang member, *Millender* specifically noted that

1   authorization to broadly search and seize gang related evidence is invalid where the affidavit does

2   not establish a link between the *gang-related materials and a crime* — even if the suspect is a

3   gang member. *Id*. at 1031–32.

4       Finally, there was no probable cause supporting the broad authorization to search and seize

5   "[a]ny news clippings tending to relate details or reference to any crime or crimes of violence" as

6   there was no indication in the affidavit that any violence was committed by defendant Lopez or

7   that evidence of violence would be found at 1753 Fulton Street.

8       In sum, it appears the only items listed in the search warrant that were supported by

9   probable cause were: (1) "paperwork indicating the purchase of any .45-cal firearm ammunition,

10  or rifle, where the firearms may be stored or how the firearms were disposed of and any documents

11  establishing dominion and control over any of the above described items"; and (2) "[a]ny articles

12  of personal property tending to establish the identity of persons who have dominion and control

13  over the premise and automobile searched . . ." The only item seized that fits into this description

14  is the "indicia and citation in the name of Erick Lopez." All other items — the social security

15  card; the CD case with gang graffiti; and a gang-related magazine — must be suppressed.

16      The good faith exception to the exclusionary rule does not apply because the warrant and

17  the warrant affidavit were so lacking in indicia of probable cause that belief in its existence would

18  have been unreasonable. *Leon*, 468 U.S. at 923. It is clear from the face of the warrant that it

19  sought materials far afield of evidence regarding unlawful possession of the .45-caliber firearm,

20  possibly based on the mistaken belief that gang membership alone suffices to establish probable to

21  seize broad categories of firearms and gang-related material. The *Herring* exception to the

22  exclusionary rule, however, does not apply to objectively unreasonable mistakes of law and

23  accordingly does not bar application of the exclusionary rule here. *See Song Ja Cha*, 597 F.3d at

24  1005. Additionally, the search warrant was so egregiously overbroad that exclusion will serve a

25  beneficial deterrent effect against overbroad warrants.

## B.    Search of Cell Phone (Dkt. No. 2538)

27      Defendant Erick Lopez seeks to suppress evidence seized from the search of his cell phone

28  (Dkt. No. 2538). For the reasons stated herein, the motion is **DENIED**. There was sufficient

16

1    probable cause for the search warrant to issue and the transfer of the phone to ICE agents to assist

2    with unlocking the phone did not exceed the scope of the search warrant.[4]

3                            *              *              *

4          The facts relevant to the motion are as follows.  As described above with respect to

5    defendant Lopez's motion regarding 1753 Fulton Street, defendant Lopez and Edwin Ramos were

6    arrested for possessing a loaded .45-caliber handgun.  After their arrest, both were interviewed

7    separately by Sergeant Mario Molina.  Defendant Lopez's cell phone was seized by the SFPD

8    incident to his arrest.  Defendant Lopez has confirmed that the cell phone was his personal

9    property (Dkt. No. 2722-1).

10         After the phone was seized, SFPD Officer Mario Molina obtained a state search warrant for

11   the contents of the cellular phone which was issued by San Francisco Superior Court Judge

12   Robertson.  Thereafter, the SFPD sought the assistance of ICE agents in unlocking the cell phone.

13   ICE agents thereafter unlocked the cell phone and the contents of the phone were downloaded and

14   imaged by ICE Special Agent Kendrick Yeung.

15                           *              *              *

16         Defendant Lopez moves to suppress the records seized from his cell phone on the grounds

17   that Sergeant Molina's search warrant affidavit did not establish probable cause to believe that the

18   cell phone records would tend to show a crime had been committed.  The relevant substantive

19   differences between Sergeant Molina's search warrant affidavit and Sergeant McDonnell's search

20   warrant affidavit in support of the 1753 Fulton Street warrant — discussed above — were that

21   Sergeant Molina's affidavit specified: (1) defendant Lopez was very guarded of his cell phone

22   while being interviewed; (2) Sergeant Molina observed a roster on the phone with names he

23   recognized to be affiliated with MS-13; (3) gang members use their phones to communicate with

24   each other before, during, and after crimes; and (4) gang members take photographs of themselves

25   posing with firearms and defendant Lopez's phone had camera features.

26

27

28   _____

[4] Defendant Lopez's reply brief notes that counsel may challenge the admissibility of call records from
Metro PCS if the government seeks to admit such evidence (Reply 8–9).  As no specific relief regarding this
issue was requested, the instant order does not address this passing comment.

The aforementioned expansions from Sergeant McDonnell's affidavit established probable cause to seize the data stored on defendant Lopez's cell phone. Given defendant Lopez's furtiveness during his interview and Sergeant Molina's statement that gang members take photographs of themselves posing with firearms, there was a fair probability that further evidence of defendant Lopez's unlawful possession of the .45-caliber handgun would be found on his cell phone. *See Gates*, 462 U.S. at 238 (1983).

Moreover, unlike the search warrant for 1753 Fulton Street, the cell phone search warrant was not a general, overbroad warrant. Accordingly, even if probable cause was lacking, the *Herring* exception to the exclusionary rule would apply. The search warrant was not so lacking in probable cause that its deficiencies could be said to be the result of sufficiently deliberate or culpable conduct that could be meaningfully deterred by exclusion. *See Herring*, 555 U.S. at ___; 129 S. Ct. at 702.

*        *        *

Defendant Lopez also argues that the transfer of the cell phone to ICE agents to unlock and download its contents exceeded the scope of the state search warrant. Specifically, he argues that the following provision in the search warrant precluded any federal agents from executing the warrant:

> THE PEOPLE OF THE STATE OF CALIFORNIA TO ANY SHERIFF, POLICE OFFICER, OR PEACE OFFICE IN THE CITY AND COUNTY OF SAN FRANCISCO: proof by affidavit having been made before me by Officer Mario Molina #1586, that there is probable cause to believe that the property, and/or things described herein may be found at the locations set forth herein and that it is lawfully seizable pursuant to Penal Code Section 1524 as indicated below . . .

This argument fails. *First*, the federal agents were simply *assisting* the state authorities in accessing data on his cell phone. Defendant Lopez has not provided any authority for the proposition that *assistance* by federal agents in accessing data on a cell phone qualifies as an execution of a warrant in the traditional sense. Unlike the execution of a warrant to search a residence, the unlocking and collection of data from the cell phone by ICE was a technical task not involving discretion. Moreover, there is no indication in the record that ICE assisted in unlocking and mining the cell phones for a bad faith purpose or to obtain data for a federal investigation,

18

1   such that application of the exclusionary rule would be warranted. *See United States v. Crawford*,

2   657 F.2d 1041, 1048 (9th Cir. 1981) (finding that absent showing of bad faith, federal agent's

3   participation in execution of state search warrant did not require application of exclusionary rule

4   under FRCrP 41).

5        *Second*, although defendant Lopez cites California Penal Code Section 830.1 for the

6   proposition that federal law enforcement officers are not "peace officers" who may execute

7   warrants, state law does not dictate whether defendant Lopez's Fourth Amendment right was

8   violated. As the Supreme Court has explained, "it is not the province of the Fourth Amendment to

9   enforce state law." *Virginia v. Moore*, 553 U.S. 164, 178 (2008).

10        **C.    Warrantless Stop and Cold Show on January 8, 2006 (Dkt. No. 2529)**

11        Finally, defendant Erick Lopez moves to suppress: (1) all evidence seized as a result of his

12   warrantless stop, detention, and arrest by SFPD Officer Aaron Fischer and Officer Luis Oliva on

13   January 8, 2006; and (2) his identification by the victim of a shooting at 896 Valencia in San

14   Francisco (Dkt. No. 2529). As explained herein, an evidentiary hearing is warranted.

15        The relevant part of the current record is as follows. On January 8, 2006, Officer Fischer

16   and Officer Oliva responded to a dispatch call regarding a shooting at 896 Valencia Street. The

17   officers were informed that the suspects involved had run a block away into Mission Playground.

18   The incident reports do not indicate that dispatch provided a description of the suspects. The CAD

19   report states: "bunch of male on the Valencia running around, and yelling . . . RP stated seeing

20   poss LMA, blk tops, shirts and underwear handing out, jean . . . but did not see any wpnse" (Dkt.

21   No. 2706-1 at 2) (abbreviations in original). There is no indication in the record, however, that

22   this information was transmitted to Officer Fischer or Officer Oliva.

23        As Officer Fischer and Officer Oliva drove towards the entrance of Mission Playground,

24   they saw defendant Lopez walking on the sidewalk. According to Officer Fischer's incident

25   report, when the officers drove by, defendant Lopez looked directly into the patrol vehicle, double-

26   backed and started walking in the opposite direction, and tried to hide behind a parked car. In

27   contrast, defendant Lopez's sworn declaration stated that although he started walking in the

28

opposite direction upon seeing the police, he did not try to hide from the police and he did not hide behind a parked car (Dkt. No. 2529-1).

Defendant Lopez's sworn declaration stated that the officers then jumped out of their vehicle, yelled at him to get down on the ground, pointed a shotgun at him, and handcuffed him although he had already complied. In contrast, Officer Fischer's report vagued out on this key point and simply states that defendant Lopez was detained.

Thereafter, the officers Mirandized defendant Lopez and walked him to the ambulance where the victim was being treated. The incident reports by both Officer Bucy and Officer Fischer specify that a reverse cold show was conducted. The Bucy incident report, however, notes that before the cold show admonition form could be read to the victim, a medic said "hey look over there" to the victim and the victim then "glared at Lopez and said 'that's the fucking homey there'" (A000261).

*      *      *

Defendant Lopez has alleged issues of material fact with sufficient definiteness, clarity, and specificity such that an evidentiary hearing is warranted. Although defendant Lopez urges the undersigned to rule on the motion without a hearing because the government failed to submit sworn declarations — defendant Lopez's declaration conflicts with the police reports and an evidentiary hearing is warranted to resolve these inconsistencies. Moreover, the police reports "vague out" on some key aspects for which defendant Lopez's declaration does not offer clarification. The specific issues that require further clarification are as follows.

*First*, the parties dispute whether defendant Lopez hid behind a van upon seeing the police officers. Both Officer Fischer's and Officer Oliva's incident reports recount that defendant Lopez did so, but defendant Lopez has submitted a declaration stating that he did no such thing. Complicating matters, neither Officer Fischer nor Officer Oliva submitted sworn declarations to support the government's assertion that defendant Lopez hid behind a van.

*Second*, although defendant Lopez's declaration specifies that the officers yelled at him, "proned" him, and handcuffed him, the government does not appear to concede this fact and the police reports vague out on the issue.

20

*Third*, the parties dispute whether the identification of defendant Lopez by the victim was part of a reverse cold show or if it was a spontaneous utterance by the victim. Although the incident reports state a reverse cold show was conducted, the government's brief argues that although one was intended, the victim spontaneously identified defendant Lopez before it could occur (Opp. 9). Accordingly, further detail is required regarding the circumstances of the identification.

*Fourth*, if it is determined that a reverse cold show was in fact conducted and it was impermissibly suggestive, further information will be required to weigh the reliability factors set forth in *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972) (articulating the reliability factors as: opportunity of witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness, length of time between the crime and the confrontation).

The evidentiary hearing will be held on JANUARY 5 AT 8:00 A.M. Either or both Officer Oliva and Officer Fischer must be made available for the hearing. It is up to the government if Officer Bucy or other witnesses present during the eyewitness identification need also testify. The victim will not be required to testify at the evidentiary hearing, as the *Biggers* factors may not need to be reached, depending on the outcome of the hearing.

**4. DEFENDANT GUILLERMO HERRERA'S MOTION TO SUPPRESS (DKT. NO. 2415)**

Defendant Guillermo Herrera moves to suppress statements made to the SFPD on July 15, 2008 (Dkt. No. 2415). The motion alleges that he was questioned in clear contravention of his Fifth Amendment and the Sixth Amendment rights. Both parties agree that no evidentiary hearing is necessary as there are no disputed material issues of fact.

For the reasons stated herein, the motion is **GRANTED**. The questioning of defendant Guillermo Herrera violated his Fifth Amendment right to remain silent.

\*                    \*                    \*

The undisputed facts are as follows. On August 27, 2007, defendant Guillermo Herrera pled guilty to misdemeanor battery (Dkt. No. 2415-1 at 18). On June 30, 2008, he entered into an agreement to special conditions of release related to the misdemeanor battery conviction (*id.* at

20).  One of the conditions agreed to was that he would stay 150 yards away from the area bounded by 19th Street, South Van Ness Avenue, 20th Street, and Guerrero Street in San Francisco.

On July 15, 2008, SFPD Officer Garcia and Officer Dempsky observed defendant Guillermo Herrera at 16th Street and Mission Street — which was in the area covered by the probation stay-away order (*id*. at 27).  Officer Garcia was aware that defendant Guillermo Herrera's presence in the vicinity violated his probation, arrested him, transported him to Mission Police Station, and booked him.  This booking took place at approximately 1:28 p.m. and defendant Herrera provided 1863 Oakdale as his address at that time.

A little over two hours after his booking, Sergeants McDonnell and Molina questioned defendant Guillermo Herrera while he was in custody.  Sergeant Molina Mirandized him, and he subsequently requested to speak to "his attorney" (*id*. at 33).  Thereafter, he stated he lived at 1863 Oakdale.  Sergeant McDonnell's incident report did not make clear whether he provided his address *sua sponte* or in response to a question.  Sergeant McDonnell responded, "I [Sergeant McDonnell] have been to that house and you moved."  Sergeant McDonnell's report stated that defendant Guillermo Herrera "said no he lives there."  Thereafter, Sergeant McDonnell performed a search at 1863 Oakdale and confirmed that defendant Guillermo Herrera lied about his address and did not live at the 1863 Oakdale.

*          *          *

The motion alleges that Sergeant McDonnell's questioning was an interrogation in violation of defendant Guillermo Herrera's Fifth Amendment right to remain silent.  There is no dispute that he requested counsel after being Mirandized.  Interrogation must cease once a suspect requests counsel.  *Davis v. United States*, 512 U.S. 452, 458 (1994).  The issue is whether Sergeant McDonnell's questions regarding his address constituted interrogation, or was merely a routine gathering of background biographical information that did not constitute interrogation.  *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006).  Gathering of background, biographical data can constitute interrogation, however, if the questioning was reasonably likely to invoke an incriminating response.  *Rhode Island v. Innis*, 446 U.S. 291, 301–02 (1980).  This is because of

1    the potential for "abuse by law enforcement officers who might, under the guise of seeking

2    'objective' or 'neutral' neutral information, deliberately elicit an incriminating statement from a

3    subject." *United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981).

4        Here, although Sergeant McDonnell's inquiries were at face value regarding biographical

5    information, the context of the questioning — as reflected in Sergeant McDonnell's own report —

6    made clear that Sergeant McDonnell would likely invoke an incriminating response from

7    defendant Guillermo Herrera. Sergeant McDonnell clearly believed that he was lying about his

8    address and it was reasonably likely that any further confrontation or questioning on the issue

9    would invoke further incriminating responses that would violate California Penal Code Section

10   148. Accordingly, Sergeant McDonnell's questioning constituted interrogation. Defendant

11   Guillermo Herrera's statements regarding the incorrect address must be suppressed as his Fifth

12   Amendment right to remain silent was violated.

13       As the statements were clearly elicited in violation of the Fifth Amendment and must be

14   suppressed, there is no need to address the alternative argument that the Sixth Amendment right to

15   counsel was violated by the continued questioning.

16                                    **CONCLUSION**

17       As stated herein, the motions to suppress filed by defendant Jonathan Cruz-Ramirez and

18   defendant Luis Herrera are **DENIED** (Dkt. Nos. 2410, 2418). The motion to suppress filed by

19   defendant Guillermo Herrera is **GRANTED** (Dkt. No. 2415). Defendant Erick Lopez's motion to

20   suppress regarding the search of his cell phone is **DENIED** (Dkt. No. 2538). His motion to suppress

21   regarding the search of 1753 Fulton Street, however, is **GRANTED** (Dkt. No. 2530). Finally, an

22   evidentiary hearing will be held on **JANUARY 5 AT 8:00 A.M.** on his motion to suppress regarding

23   the warrantless stop and cold show (Dkt. No. 2529).

24

25       **IT IS SO ORDERED.**

26

27   Dated:  December 22, 2010.
                                    _____
28                                  WILLIAM ALSUP
                                    UNITED STATES DISTRICT JUDGE