IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JONATHAN CRUZ-RAMIREZ, *et al*.

    Defendants.

No. CR 08-0730 WHA

**ORDER EXCLUDING PROPOSED MENTAL CONDITION TESTIMONY OF DR. ANTOLIN LLORENTE AND SOCIAL WORKER GINGER HOLMAN**

## INTRODUCTION

The government moves to exclude the testimony of defendant Jonathan Cruz-Ramirez's proposed mental condition expert witnesses Dr. Antolin Llorente and licensed clinical social worker Ginger Holman (Dkt. No. 3371). For the reasons stated herein, the government's motion is **GRANTED**.

## STATEMENT

Like the questions concerning a co-defendant's proposed expert witness, the issue has its roots in the early days in this case when certain defendants — including defendant Jonathan Cruz-Ramirez — were eligible for the death penalty. As the government was conducting its deliberations regarding whether it would seek the death penalty against him, defendant Cruz-Ramirez submitted mitigation evaluation/reports from neuropsychologist Dr. Antolin Llorente and licensed clinical social worker Ginger Holman. On September 16, 2010, however, the government filed notice that it would *not* seek the death penalty against any

defendant (Dkt. No. 2273).

On January 23, defendant Jonathan Cruz-Ramirez filed a notice of intent to offer the same individuals — Dr. Llorente and Social Worker Holman — to testify as experts on guilt issues (Dkt. No. 2946). Although the notice did not specify the particulars, it has since become clear that Dr. Llorente and Social Worker Holman's opinions would be based on nothing more than the mitigation packet submitted to the government during its deliberations on whether to seek the death penalty.

In response, the government filed an omnibus motion to preclude this (and other) proposed mental health expert testimony on the basis of insufficient notice (Dkt. No. 3371). In the alternative, the government moved for additional disclosures and a delayed opportunity to submit *Daubert* challenges after obtaining further disclosures. After oral argument at the final pretrial conference, the request for additional disclosures was granted, and the defense was ordered to submit supplemental disclosures (Dkt. No. 3522). In turn, the government was given until February 28 to submit any motions to exclude based on these new disclosures.

Defendant Cruz-Ramirez did not file a supplemental disclosure with the Court (although a disclosure may possibly have been submitted directly to the prosecution), but in co-pending litigation over the proper scope of the government's FRCrP 12.2(c) mental-condition examination of defendant Cruz-Ramirez, his counsel explained that the witnesses would address his cognitive functioning, psychological condition, and other evidence bearing on his demeanor, manner of interaction with others, need for acceptance, and the fact his mental condition made him a "talker," impressionable, and "eager to please" (Dkt. No. 3096). This proposed testimony was directed in part at trying to explain away inculpatory admissions by defendant Cruz-Ramirez as mere barroom boasts (Dkt. No. 3096).

On February 22, 23, and 24, 2011, the government's mental condition rebuttal doctor — Dr. E. M. Suarez — examined defendant Cruz-Ramirez pursuant to court order (Dkt. No. 3355). The order authorizing the examination provided a number of safeguards governing the examination, including: notice to defense counsel of the general scope of the evaluation and the specific tests to be conducted, defense counsel presence at a nearby location so he could

consult with the defendant if necessary, and recording of the evaluation for defense counsel's later review. In order to protect defendant Cruz-Ramirez's Fifth Amendment right against self-incrimination, the order also specified that the government was prohibited from referencing at trial the compelled examination or statements made by defendant Cruz-Ramirez unless the defense first introduced expert testimony on mental condition at trial.[1] Furthermore, the order specified that the government examiner would not be permitted to rely on any portion of the examination that the undersigned later deemed to be improper.

Defendant Cruz-Ramirez's argument that his asserted mental condition was only relevant to the conspiracy counts and not the VICAR homicides, however, was rejected. Accordingly, the order stated that the *evaluation* could extend to defendant Cruz-Ramirez's mental condition with respect to the charged VICAR homicides but also explained that "[t]his does not mean, however, that the examiner may inquire into crime facts unrelated to defendant Cruz-Ramirez's mental condition." The order also noted that not all of the results of the evaluation would necessarily be admissible at trial, as the government's examiner was limited to using the evaluation for rebuttal of the mental-condition evidence presented by defendant Cruz-Ramirez.

After the conclusion of the examination, the government moved to exclude the testimony of defendant Cruz-Ramirez's proposed mental-condition witnesses under FRCrP 12.2(d) due to his refusal to answer "crime fact" questions. To that effect, defendant Cruz-Ramirez submitted a brief addressing the government's challenge and reiterated that his witnesses sought "only" to testify regarding his:

> [N]europsychological and cognitive functioning, as well as an interpretation of his history by trained mental health experts to explain his profound need for acceptance; his lack of education; his low cognitive functioning; his impaired neuropsychological functioning to demonstrate that the inconsistent admissions he made after his arrest in this case, and his varying statements to persons on the streets and after being arrested, were provided in part because of his need to

---

[1] The parties stipulated to almost all procedures governing the examination and the use of the examination's results (Dkt. Nos. 3174, 3224). The sole disagreements were limited to: (1) the proper scope of questioning regarding VICAR homicide "crime facts"; and (2) the scope of pre-examination notice of the tests the government examiner would implement.

3

> belong, and his need to feel that he is not being rejected by
> those around him — as he was for many years by his own
> family . . . (Dkt. No. 3832).

After a hearing on the issue, the government was ordered to submit a declaration identifying: (1) which questions defendant Cruz-Ramirez refused to answer; and (2) why any such refusal to answer frustrated Dr. Suarez's ability to offer his opinion in full or in part (Dkt. No. 3843). In response to this order, Dr. Suarez submitted a declaration identifying the numerous questions defendant Cruz-Ramirez refused to answer (Dkt. No. 3957). For the record, defendant Cruz-Ramirez filed under seal a copy of the translated transcript of the mental examination. The transcript revealed that the questions defendant Cruz-Ramirez refused to answer constituted virtually all questions relating to his criminal history, involvement in particular crimes, and his views on why he was indicted in this case. He also refused to answer specific questions about his prior interactions with government informants SF-1211 and SF-1218 and whether those informants (or any other individuals) threatened, induced, or encouraged him to take certain actions, all as now being asserted at trial. For example, defendant Cruz-Ramirez refused to answer:

- Whether SF-1211 or SF-1218 ever asked him to kill anyone;
- Whether SF-1211 or SF-1218 were members of MS-13;
- Whether SF-1211 or SF-1218 influenced or threatened him while he was incarcerated;
- What year he reported to his probation officer that SF-1211 and SF-1218 threatened to take his life if he did not do what was asked;
- Whether he was aware that what he was asked to do by SF-1211 or SF-1218 was "wrong, a crime or illegal";
- Whether he had ever told SF-1211 of SF-1218 about the crimes he had committed;
- Whether SF-1211 or SF-1218 had physically assaulted him;
- What was going on in his mind at the time he was allegedly induced by SF-1211 or SF-1218 to commit crimes; and
- Whether SF-1211 or SF-1218 were leaders of MS-13.

Similarly, defendant Cruz-Ramirez refused to answer questions about past violent acts, his attitudes toward violence and crime, and his association with MS-13. These refused questions included:

- Whether he knew what *the police* believe he has done;
- How many times he had previously been arrested;
- What the circumstances of his prior deportation were;
- Whether he knew what the charges were against him in this case;
- How he had become influenced to be involved in the gang;

4

- Whether he had to undergo initiation to join the gang; and
- Other questions regarding his association with MS.

Nonetheless, because Dr. Suarez's declaration only offered a generalized conclusion that defendant Cruz-Ramirez's refusal to answer made it impossible for him to draw any conclusions or make any inferences regarding his mental condition, Dr. Suarez was ordered to provide further detail to assist the Court in understanding why he could not develop any rebuttal testimony due to the refusals (Dkt. No. 4101).

In order to ensure that Dr. Suarez had an adequate picture of what his testimony would be rebutting, defendant Cruz-Ramirez's proposed experts — Dr. Llorente and Social Worker Holman — were ordered to submit further declarations that specified their proposed testimony in detail. Defendant Cruz-Ramirez accordingly submitted an additional declaration from Dr. Llorente and a letter from Social Worker Holman under seal.[2]

The government thereafter submitted a further declaration from Dr. Suarez that explained why he could not develop rebuttal opinion because of defendant Cruz-Ramirez's refusals to answer crime-fact questions (Dkt. Nos. 4278). The declaration explained why each of the questions asked was necessary for Dr. Suarez to develop his rebuttal opinion. The government also submitted an accompanying memorandum that raised *Daubert*, Rule 403, and Rule 704(b) objections to the proposed opinions (Dkt. No. 4288).

Defendant Cruz-Ramirez submitted a reply which clarified that Dr. Llorente's testimony was offered to present his assessment of defendant Cruz-Ramirez's "cognitive functioning" and a "neuropsychological assessment, including an interpretation of [defendant Cruz-Ramirez's] history as a teenaged immigrant seeking reunion with his family in this country, as a basis for explaining Mr. Cruz-Ramirez's vulnerability to gang-related inducement and entrapment" (Dkt. No. 4313). The reply also explained that Social Worker Holman's testimony was offered because she interviewed defendant Cruz-Ramirez in 2005 and a portion of that interview focused on his "relationship with Sureno gang life, and with

---

[2] Social Worker Holman's employer — the City and County of San Francisco — would not authorize her to submit a sworn declaration. Accordingly, Social Worker Holman merely submitted an unsworn letter.

5

his personal and familial history" and his self-proclaimed "intention, prior to his incarceration at the Log Cabin Ranch, to move away from gang life and the San Francisco area."

On June 13, there was more oral argument. Counsel for defendant Cruz-Ramirez confirmed that fifty percent of Dr. Llorente's testimony would be focused on defendant Cruz-Ramirez's tendency to brag and exaggerate about criminal acts, whether or not he actually did them, and the remainder would be focused on his susceptibility to inducement (Tr. 9852–53).

**ANALYSIS**

**1.    FRCrP 12.2(d).**

The government is entitled to present rebuttal to a defendant's mental-condition expert testimony, and to this end, a defendant may be compelled to submit to an examination to the extent necessary for rebuttal. *See Buchanan v. Kentucky*, 483 U.S. 403, 422–423 (1987); FRCrP 12.2(c). FRCrP 12.2(d) authorizes the exclusion of a defendant's proposed mental-condition evidence if the defendant refuses to submit to a court-ordered examination, thereby frustrating the government's ability to offer rebuttal testimony. Accordingly, the relevant question is whether defendant Jonathan Cruz-Ramirez's refusal to answer virtually all crime fact questions — despite clear court order — now warrants the exclusion of his proposed mental-condition expert testimony. This order finds such exclusion is warranted.

In determining what sanctions, if any, should be imposed, the advisory committee notes to the 2002 amendments to FRCrP 12.2(d) advise that "the effectiveness of less severe sanctions, the impact of preclusion on the evidence at trial and the outcome of the case, the extent of prosecutorial surprise or prejudice, and whether the violation was willful" should be considered. Here, it is clear that defendant Cruz-Ramirez's wholesale refusal to comply with large portions of the examination frustrated Dr. Suarez's ability to develop any rebuttal opinion. Dr. Suarez's sworn assertions to that effect have not been met or countered by either Dr. Llorente or Social Worker Holman.

Dr. Suarez's sworn declaration is also borne out by the transcripts of the examination. The transcripts make clear that defendant Cruz-Ramirez refused to answer a multitude of questions relevant to his asserted mental condition. Again, although defendant Cruz-Ramirez

claims (via counsel) that he was induced by SF-1211 and SF-1218 and was especially susceptible to entrapment, defendant Cruz-Ramirez refused to answer:

- Whether SF-1211 or SF-1218 ever asked him to kill anyone;
- Whether SF-1211 or SF-1218 were members of MS-13;
- Whether SF-1211 or SF-1218 influenced or threatened him while he was incarcerated;
- What year he reported to his probation officer that SF-1211 and SF-1218 threatened to take his life if he did not do what was asked;
- Whether he was aware that what he was asked to do by SF-1211 or SF-1218 was "wrong, a crime or illegal";
- Whether he had ever told SF-1211 of SF-1218 about the crimes he had committed;
- Whether SF-1211 or SF-1218 had physically assaulted him;
- What was going on in his mind at the time he was allegedly induced by SF-1211 or SF-1218 to commit crimes; and
- Whether SF-1211 or SF-1218 were leaders of MS-13.

Similarly, defendant Cruz-Ramirez refused to answer questions about past violent acts, his attitudes towards violence and crime, and association with MS-13. These unanswered questions included:

- Whether he knew what *the police* believe he has done;
- How many times he had previously been arrested;
- What the circumstances of his prior deportation were;
- Whether he knew what the charges were against him in this case;
- How he had become influenced to be involved in the gang;
- Whether he had to undergo initiation to join the gang; and
- Other questions regarding his association with MS-13.

Defendant Cruz-Ramirez's willful and blanket refusal to answer the relevant questions prevented Dr. Suarez from assessing, among other things, whether defendant Cruz-Ramirez: (1) was particularly susceptible to inducement; (2) was predisposed to violence; and (3) had in fact bragged about past violent acts that he had never committed. Because defendant Cruz-Ramirez's refusal to answer crime-fact questions prevented Dr. Suarez from developing any rebuttal opinion to defendant Cruz-Ramirez's noticed mental-condition expert testimony, complete exclusion of that testimony is warranted. No less severe sanction is fair in such a circumstance. The violations at issue were willful and informed. The order authorizing the examination made clear that Dr. Suarez was permitted to ask the questions that he did and Dr. Suarez even apprised defense counsel of the consequences of the refusals to answer and its impact on his ability to develop rebuttal opinion (Dkt. No. 4277, ¶ 7).

7

### 2. RULE 403.

Moreover, the proposed mental condition testimony should be excluded under Rule 403 because the probative value of the proposed testimony is far outweighed by the risk of unfair prejudice, juror confusion, and waste of time.

The probative value is certainly quite minimal. Neither Dr. Llorente nor Social Worker Holman has submitted any actual diagnosis of any mental condition suffered by defendant Cruz-Ramirez probative to his assertion that he was: (1) particularly susceptible to inducement; and (2) a mere "talker" who sought approval from others by bragging about crimes he did not commit. Indeed, the defense experts' submissions indicate that neither was willing to commit to a clear position regarding defendant Cruz-Ramirez's mental condition.

Dr. Llorente's only *affirmative* mental condition opinions were that defendant Cruz-Ramirez: (1) was *not* mentally retarded; (2) has had *relatively* low cognitive functioning; and (3) has had intellectual functioning at a "borderline level." Otherwise, Dr. Llorente's opinions were simply that he could "rule out the possibility" of other possible mental conditions. But even these opinions were not without qualification. Dr. Llorente admitted that the purpose of his evaluation was to address counsel's questions and the evaluation "did not purport to address a number of issues that might be raised in a criminal case, such as mental state at the time of the crime, insanity, or competence to stand trial . . . [i]n order to be able to answer such questions, a broader assessment would have been required . . . " (May 3 Llorente Decl. ¶ 5). Dr. Llorente also explained that the testing/evaluation results were "not definitive" but opined that they provided him with "*some* level of confidence" in his prior assessment that defendant Cruz-Ramirez's intellectual functioning was borderline (*id*. at ¶ 9).

Similarly, Social Worker Holman did *not* render a diagnosis of defendant Cruz-Ramirez. Her most definitive statement was merely that in 2005 defendant Cruz-Ramirez "exhibited symptoms which are associated with Post-Traumatic Stress Disorder, depression and possible undiagnosed Attention Deficit Hyperactivity Disorder" (May 11 Holman Decl.). Everyday, of course, perfectly health people "exhibit symptoms associated with" various diseases and conditions without having any disease or condition. Forgetfulness is one

example. Irrationality is another. Nowhere does Social Worker Holman conclude that defendant Cruz-Ramirez actually had any specific mental illness or mental condition. Her vague opinions offer virtually no probative value. Much time would be consumed in cross-examining these musings. Much confusion would be generated.

Although neither witness would offer any probative diagnoses, both are clearly poised to shoehorn in hearsay (and even hearsay-within-hearsay) regarding defendant Cruz-Ramirez's difficult childhood, harsh family life, and desert entry to the United States — traditional mitigation concerns in the penalty phase of a death penalty case but not traditional proof in the *guilt* phase of any case. One particularly self-serving example is Social Worker Holman's assertion that defendant Cruz-Ramirez told her "he wanted to leave the gang that he was associating with, but he was aware that such an action would involve reprisals against him and possibly against his family." This would not be expert opinion. It would be mere repetition of a self-serving say-so by a party on trial with no way to cross-examine. It would be hearsay and fundamentally unfair to receive in evidence.

The instant scenario is unlike *United States v. Sandoval-Mendoza*, 472 F.3d 645 (9th Cir. 2006). There, both the government experts and the defense experts agreed that the defendant suffered from an actual, unusually large pituitary tumor that compressed the defendant's frontal lobe, causing brain damage with demonstrated impacts on his reasoning processes. Our court of appeals held that the district judge erred in excluding the testimony. Nothing here comes even close to that scenario. Instead, the witnesses have submitted vague commentary about defendant Cruz-Ramirez's tendency to be easily influenced by others and his tendency to take credit for violent acts he may or may not have committed.

Additionally, unlike *Sandoval-Mendoza*, the proposed opinions are not the only sources for testimony regarding defendant Cruz-Ramirez's purported "talker" tendencies and susceptibility to entrapment. As defense counsel acknowledges, lay witnesses have and will testify to their view that defendant Cruz-Ramirez was "boastful" and "unsophisticated" and made "fairly primitive attempts to curry favor" with others (Dkt. No. 4313 at 5). Indeed, a number of the *government*'s witnesses have already explained that although defendant Cruz-

Ramirez bragged about committing various criminal acts, they did not believe his statements to be true. This firsthand lay testimony is far more probative than the testimony offered by Social Worker Holman or Dr. Llorente.[3]

**IT IS SO ORDERED.**

Dated: June 17, 2011.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[3] This order does not exclude any *percipient* testimony that Social Worker Holman or Dr. Llorente may be able to offer, subject to the standard evidentiary requirements.